## ESTATE OF CLAUS SPRECKELS, DECEASED.

### [No. 6,977 (N. S.); decided February 15, 1910.]

**Void Trust.**—A Devise and Bequest of All the Real and Personal estate of a testator to designated trustees "in trust," with directions to pay over the net annual income to his widow for life, and upon her death "to divide the estate into three equal parts, when one of the parts shall be forthwith assigned, transferred, set over and delivered" by such trustees to one of the sons of the testator, whereupon "the same shall be and become his absolutely and forever," and another part to another son in the same manner, and the remaining part to be continued to be held in trust by such trustees and the net annual income paid to the daughter of the testator for life and upon her death "to pay over the principal" of such part to her children or grandchildren, as the case may be, "when the same shall become theirs absolutely and forever," is as to the real estate a void trust.

**Void Trust.**—Such Devise and Bequest is Also a Void Trust as to the personal property, it appearing therefrom and from the whole will that the realty and personalty are united in one inseparable trust scheme.

**Void Trust.**—Such a Devise and Bequest is also invalid as a devise, notwithstanding the trustees and beneficiaries are the same persons and the words therein that "the same shall become his absolutely and forever."

**Void Trust.**—Such Devise and Bequest in so far as attempting to create a trust in the daughter's part avoids the whole trust scheme, being an undue suspension of the power of alienation, owing to the uncertainty of the persons who ultimately are to take such part.

**Will—Intention of Testator.**—If a Testator Misapprehends the legal effect of his expressed intent, the court is not authorized to enter into his mind to ascertain his intention, but must gather his meaning from his words.

**Equitable Conversion.**—In Order to Work an Equitable Conversion of real property disposed of by will into personalty, the direction to sell must be positive, irrespective of all contingencies and independent of discretion.

**Void Trust—Preservation as Power.**—A void trust cannot be preserved as a power, as powers are no part of the statutory scheme of trust in this state.

**Trust—A Beneficiary may be a Trustee for himself.**

**Definitions.**—The Term "Transfer" has an application in California to the transmission of title to real property and is of equivalent signification and effect to "grant."

Devise and Legacy—Definition and Distinction.—The Term "Devise" is confined exclusively to real, and the term "legacy,, to personal, property.

Trust.—The Limitation of Suspension of the Power of Alienation expressed in section 715 of the Civil Code applies to all trusts, whether of real or personal property.

Application by Claus A. Spreckels and Rudolph Spreckels, as trustees, for partial distribution. Demurrers by John D. Spreckels and Adolph B. Spreckels, as heirs and persons interested in the estate.

Cushing & Cushing, O. K. McMurray and William Grant, for applicants.

Morrison, Cope & Brobeck, Peter F. Dunne, Samuel M. Shortridge and W. M. Hohfeld, for demurrants.

COFFEY, J. This is an application by Claus A. Spreckels and Rudolph Spreckels, as trustees of the trusts created by the will of Claus Spreckels, deceased, asking that their respective shares in the property described in their petition be distributed to them in accordance with law and the provisions of said will.

It appears by the petition that Claus Spreckels died in San Francisco, of which place he was a resident, on December 26, 1908, leaving real and personal estate therein, and a will which was in regular course admitted to probate, and letters testamentary issued thereupon to the persons named therein as executors. The testator left him surviving his widow, Anna Christina Spreckels; Claus A. Spreckels and Rudolph Spreckels, sons and petitioners herein; a daughter, Emma C. Ferris; and sons, John D. Spreckels and Adolph B. Spreckels, the demurrants.

THE WILL.

The will is in these terms:

"I, Claus Spreckels, a citizen of the State of California, and a resident of the City of San Francisco in said State, now present in the City, County and State of New York, being of sound and disposing mind, and not under restraint or undue influence, do make, publish and declare this to be my

last will and testament, hereby revoking all other wills by me made.

"First: I declare that all the estate, whereof I may die possessed, is the community property of my wife, Anna Christina Spreckels, and myself.

"Second: I hereby give, devise and bequeath unto my Trustees hereinafter named, all my estate, real, personal and mixed, of every nature, kind and description, wherever situate and however held, which is or may be subject to my testamentary disposition at the time of my death, to have and to hold the same, in trust, nevertheless, for the uses and purposes, with the powers and in the manner hereinafter mentioned, namely, to wit:

"(a) To pay over the net annual income thereof to my wife during the term of her natural life.

"(b) Upon the death of my said wife, or upon my death if she be not then surviving, to divide said estate into three equal parts, when one of said parts shall be forthwith assigned, transferred, set over and delivered by my said Trustees to my son Claus A. Spreckels, and the same shall be and become his absolutely and forever, and another of said equal third parts shall be forthwith assigned, transferred, set over and delivered by my said Trustees to my son Rudolph Spreckels, and the same shall be and become his absolutely and forever.

"(c) To pay over the net annual income derived from the remaining equal third part of my estate to my daughter Emma C. Ferris of Kingswood, England, wife of John Ferris, during her natural life, upon her receipt without anticipation, and the same shall not be liable for her debts.

"Upon the death of my said daughter Emma, to pay over the principal of said one-third part of my estate, with all accumulations of the income therefrom, to her children then living, and so that each child shall receive an equal share thereof, and the same shall become his or hers absolutely and forever.

"Children of her deceased children shall, however, take the share which the parent would have taken had he or she survived my said daughter, and the same shall be divided between said children share and share alike. Upon the death

of my said daughter without child, children or grandchildren her surviving, the Trustees shall pay over the principal of said one-third part of my estate, with all accumulations of income therefrom, to my said sons Claus A. Spreckels and Rudolph Spreckels, share and share alike, and the same shall become theirs absolutely and forever.

"Third: If my said son Claus A. Spreckels shall not be living at the time of my death or surviving me be not living at the time of my wife's death, then all the legacies and devises given to him by this will shall go to his issue, to him in lawful wedlock born, share and share alike, and the same shall be and become theirs absolutely and forever. If my said son Rudolph Spreckels shall not be living at the time of my death, or surviving me be not living at the time of my wife's death then all the legacies and devises given to him by this will shall go to his issue, to him in lawful wedlock born, share and share alike, and the same shall be and become their absolutely and forever.

"Fourth: I make no provision in this will for my sons John D. Spreckels and Adolph B. Spreckels for the reason that I have already given to them a large part of my estate.

"Fifth: I hereby authorize my Trustees hereinafter named, to invest and re-invest the trust funds hereinbefore provided for in any securities which are approved by my said wife and by them during her lifetime, in case she survives me, and after her death, in any securities which said Trustees deem best, whether the same are or are not investments to which Executors and Trustees are by law limited in making investments, and to change or vary investments from time to time as they may deem best. I authorize and empower my Executors and Trustees hereinafter named, to hold and continue in their discretion, any security in which any of my property may be found invested at the time of my death, my intent being that they shall be absolved and discharged from the absolute legal duty of converting my estate into money, and that they shall not be liable for any shrinkage in value by reason of the exercise of the discretion hereby reposed in them.

"Sixth: I authorize and empower my Executors and Trustees hereinafter named, in their discretion to sell and dispose

of any and all of my property, real or personal, wherever situate and however held, either at public or private sale, and at such time or times and upon such terms as may seem to them meet and advisable, and to give to the purchaser or purchasers of any of my said property all deeds, bills of sale and other muniments of title which may be expedient or necessary.

"Seventh: I nominate, constitute and appoint my sons Claus A. Spreckels and Rudolph Spreckels as Executors of this my last Will and Testament, and as Trustee of any and all trusts herein created, and I direct and request that no bond or other security be required of them as such Executors or Trustees, or in any capacity in which they may act under this Will.

"In Witness Whereof, I, Claus Spreckels, the Testator above named, have to this my last Will and Testament, consisting of five pages of paper, hereunto subscribed my name and set my seal this 11th day of May, 1907.

"CLAUS SPRECKELS.

"The foregoing instrument consisting of five pages of paper was here now at the date thereof signed, sealed, published and declared by Claus Spreckels, the above-named Testator as and for his last Will and Testament, in the presence of us, who, at his request and in his presence and in the presence of each other have hereunto signed our names as subscribing witnesses.

"WILLIAM W. COOK,
"327 W. 75th St., New York.
"THOMAS B. JONES,
"471 Stealford Road, Brooklyn, New York.
"RICHARD T. THOMPSON,
"147 Park Avenue, Brooklyn, New York."

THE ISSUE INVOLVED.

To this petition separate demurrers were interposed, both presenting the same points, reducible to the one issue involving the validity of the testamentary trust.

The applicants are here not in their individual capacity as beneficiaries, but as trustees, asserting their right to distribution under what they claim to be a valid trust created by this will.

If their contention be correct, they are entitled to the distribution of this property, or to so much thereof as to which the trust may be declared valid; otherwise they cannot receive a decree in this proceeding.

In construing this will, it is not necessary to repeat the familiar rules of construction and interpretation. That a will is to be liberally construed so as to carry out the intention of the testator, and that a construction which involves intestacy will not be favored; that the duty of the court is to construe and not to construct; that the important item is the intention of the testator; that the judicial endeavor should be to uphold the will and not to break it down; that the intention is the paramount rule; and that every word in the instrument should be given full meaning, and no word rejected unless absolutely necessary,—all these constitute the canons of construction that need no citations for their support.

What did testator intend? He certainly intended and expressly said that the two sons who are here demurring to this petition should receive nothing, for the reason that he had already given them a large share of his estate. (Clause Fourth in the will.)

What was in his mind when testator made his will? The terms of the instrument show that he had in mind six persons primarily: his wife, his daughter, and his four sons; two of these latter were excluded from his consideration because of previous provision. His intention or his state of mind as to these two sons may be conceded, but it must be effectuated according to the law of the land, which he is presumed to know, for, as was said in the Estate of Young, 123 Cal. 343, 55 Pac. 1011, if he have misapprehended the legal effect of his expressed intent, the court is not authorized to enter into his mind to ascertain his intention but must gather his meaning from his words.

### SUMMARY OF THE TERMS OF THE WILL.

By his will, testator declared, first, that all the estate of which he might die possessed was the community property of his wife and himself; second, he gave, devised, and bequeathed unto his trustees all his estate, real, personal, and

mixed, of every nature, kind and description, wherever situated and however held, which was or might be subject to his testamentary disposition at the time of his death, to have and to hold the same, *in trust,* nevertheless, for the uses and purposes, with the powers and in the manner thereinafter mentioned, to provide income for his wife; upon her death, or upon his own death if she be not then surviving, to *divide* said estate into three equal parts, when one of said parts should be forthwith assigned, transferred, set over and delivered by his said trustees to his son Claus A. Spreckels, the same to be and become his absolutely and forever, and another of said parts to go in the same manner to his son Rudolph; to pay over the net income of the remaining third part to his daughter Emma, during her natural life, and upon her death to pay over the principal with accumulations of the income therefrom to her children then living, so that each child shall receive an equal share thereof, and the same should become his or hers absolutely and forever. Children of her deceased children should, however, take the share which the parent would have taken had he or she survived his daughter Emma, and the same should be divided between said children share and share alike. Upon the death of his daughter Emma without child, children, or grandchildren her surviving, the trustees should pay over the principal of said one-third part of the testator's estate, with all accumulations of income therefrom to his said sons Claus A. and Rudolph Spreckels, share and share alike, and the same should become theirs absolutely and forever; third, that if his said son Claus A. should be not living at the time of testator's death or surviving be not living at the time of testator's wife's death, then all the legacies and devises given to him by the will should go to his issue, to him in lawful wedlock born, share and share alike, and the same should be and should become theirs absolutely and forever; a like provision in the case of Rudolph; fourth, he excludes his sons John D. and Adolph B. Spreckels; fifth, he authorizes his trustees to invest and reinvest the trust funds thereinbefore provided for in, any securities which are approved by his said wife and by them during her lifetime, in case she survived testator, and after her death, in any securities which said trustees deemed best,

whether the same were or were not investments to which said executors and trustees were by law limited in making investments and to change or vary investments from time to time, as they might deem best; and the testator authorized and empowered the said executors and trustees to hold and continue in their discretion any security in which any of his property might be found invested at the time of his death, his intent being, as he declared, that they should be absolved and discharged from the absolute legal duty of converting his estate into money, and that they should not be liable for any shrinkage in value by reason of the exercise of the discretion reposed in them; sixth, he authorized and empowered his executors and trustees, in their discretion, to sell and dispose of any and all of his property, real or personal, wherever situate and however held, either at public or private sale, and at such time or times and upon such terms as might seem to them meet and advisable, and to give to the purchasers all deeds, bills of sale, and other muniments of title which might be expedient or necessary.

The foregoing is a summary of the terms of the will which the court should endeavor to execute, and it should not depart from the directions of the testator unless constrained thereto by the obligations of the law. Where his meaning is manifest it should be carried out, if that meaning be expressed in the terms of the law governing the subject matter. In the language of a recent case we must not fly in the face of the testator's express direction, as this would be violative of the first duty of the court, namely, to effectuate his intention: Estate of Washburn (Cal. App.), 106 Pac. 415. It may be said in this case, as was said in that, that the will bears the earmarks of skilled professional workmanship; and that it was drawn with a view to have its provisions faithfully followed cannot be doubted. In that case the testator selected near of kin as his trustees and devised the property to them in trust with power to manage and control the property and pay over the incomes to his widow and daughter for their support and maintenance and to the successor of either of them.

In the case just cited there is a discussion of the question of vested and contingent remainders and of the doctrine of merger which may be considered in point.

CIRCUMSTANCES EXISTING AT DATE OF WILL.

In construing this instrument, the petitioners as well as the demurrants advert to the circumstances existing at the date of the will, May 11, 1907, and the local conditions resulting from the then recent conflagration. These circumstances and conditions are too vividly impressed upon the memory to need recital; but it is argued that they must have operated upon the mind of testator and affected the testamentary act. When decedent executed this instrument he possessed, in round numbers, ten millions of dollars in property, realty more than fifty per cent, and of the remaining personalty more than a million in cash. In view of the necessity of the situation confronting him, it was natural that he should contemplate a scheme whereby this vast property should be preserved as long as possible, and increased rather than diminished and dissipated. By his energy and ability he had established a great estate, and it was his ambition and design to secure and shield the results of a long lifetime of labor by a provision protecting the fruits of his toil and maintaining the memory of his name. He was the architect of his own fortune, and he indulged the fancy that he could do what he willed with his own. Acting upon this assumption, he set about making a will to carry out his cherished idea, to administer his entire estate through the instrumentality of a trust. This idea pervades and permeates the will; it is its constant theme.

By the very first dispository provision he devises and bequeaths his entire estate to his trustees, "to have and to hold the same *in trust*." This language is clear and explicit; no amount of argument can divest these terms of their meaning. This document was drawn with great care and by a lawyer skilled in the use of words, and it is, therefore, to be presumed that the expressions employed were intended to have a legal signification. It is not the case of a layman writing his own will, without adequate attorney's aid, but that of a testator invoking professional assistance of a high grade to discharge a task implying expert knowledge united with readiness and dexterity in its application.

It must be considered, if this be conceded, that every word used in this instrument meant what it said, and by these words and phrases, as judicially defined, we shall ascertain the in-

tention of the testator. He started out to create a testamentary trust. That was his primal purpose, as we have seen. He then provides, through this trust, (a) for an income for his wife; (b) upon her death for a division of the estate, by the trustees, into three equal parts, each one to be segregated and transferred to each of the beneficiaries, Claus A. and Rudolph each to have his part absolutely and forever; and (c) Emma's share of the corpus to remain intact for the benefit of her children living at the time of her death, she to have an income meanwhile, paid out of the principal, through the trust, and failing children or grandchildren, the trustees to pay over the principal to themselves as beneficiaries.

It appears to be admitted that the first trust purpose declared by the will, to provide an income for the wife, is valid; but it is asserted that the second and third trust purposes are void, because neither is authorized by the statute: Civ. Code, sec. 857. Testator directs that upon the death of his wife the trustees are to "divide" said estate into three equal parts, and hereby hangs the discussion as to the meaning of this word "divide" in a legal sense. Petitioners maintain that the demurrants have misconceived the meaning of this word, and that it is susceptible of no such interpretation as they have assumed; that it does not signify "partition" in the narrow, restricted sense of physical separation into parts, which, in the circumstances of this case, would be impracticable, if not impossible, but it is a "division" or "partition" to be accomplished by a sale, and division of the proceeds; and, in that event, it is a valid trust under the provisions of the Civil Code; for a physical division could not have been contemplated by testator, and the testament may be construed as disposing of the entire estate as personal property; and, hence, an equitable conversion of the whole is worked as of the date of the death of the testator or, at least, as of the date of the death of his widow. It is argued that testator never intended a physical partition, and that he used no such word nor any term of synonymous import; yet we find, according to Webster, that "divide" means to make partition, and that "partition" means to "divide into shares," as, "to partition an estate"; but petitioners contend that even if demurrants be correct in their view that it is a trust to partition and con-

vey, still the will may be sustained, if it shows that it was the intention of the testator to create a trust to sell his property and apply or dispose of the proceeds. Was this the intention of the testator? Does this instrument exhibit an intention to convert into cash his real estate and to treat all as personalty? Is it correct to conclude that if clause (c) in paragraph second may be construed as meaning personalty, so must all the remainder of the will? What is equitable conversion? It is that change in property by which, for certain purposes, real estate is considered as personal, and personal as real. How is this change to be effected? Section 1338 of the Civil Code of California says that when a will *directs* the conversion of real property into money, such property and all its proceeds must be deemed personal property from the time of the testator's death; and the supreme court, in commenting upon this section in the Estate of Walkerly, 108 Cal. 652, 49 Am. St. Rep. 97, 41 Pac. 772, says that the rule of equitable conversion amounts merely to this, that where there is a *mandate to sell* at a future time, equity, upon the principle of regarding that as done which ought to be done, will, for certain purposes and in aid of justice, consider the conversion as effected at the time when the sale ought to take place, whether the land be then really sold or not.

### THE THEORY OF EQUITABLE CONVERSION.

Petitioners insist that testator contemplated a conversion and quote from a New Jersey case, Wurts' Exr. v. Page, 19 N. J. Eq. 365, where the testator authorized and empowered his executors, in case it should at any time be deemed advisable by them, to sell and convey any part of his real estate. Chancellor Zabriskie said in that case that wherever a testator has positively *directed* his real estate to be sold and distributed as money, it will be considered for the purposes of succession as personal. But in that case, there was no such direction. The direction to sell was contained in the fourth item of the will, and simply *authorized* and *empowered* his executors to sell any part of his real estate in case they should *at any time* deem it advisable. This was not a direction to convert, but on the contrary a seeming direction to let it remain as real estate, until it became advisable from time to time to sell it.

If this were the only part of the will to guide the court, the real property could not be considered as converted into personal property until actually sold; but the question of conversion is a question of intention; and the real question was, Did the testator intend that his lands should be converted into money at all events before distribution? In a Pennsylvania case, Fahnestock v. Fahnestock, 152 Pa. 56, 34 Am. St. Rep. 623, 25 Atl. 313, it was said that while a mere naked power of sale will not work a conversion of a testator's real estate, yet where it is clear from the face of the will that it was testator's intention that the power should be exercised, it will be construed as a direction to sell and will operate as an equitable conversion. Where it *plainly appears* that effect cannot be given to material provisions of the will without the exercise of this power, the conclusion is irresistible that a conversion is as effectually accomplished by the will as if it contained a positive direction to sell.

Petitioners contend that the grammatical context of the will shows that the intention was to protect the trustees in the exercise of their discretion; that not only do the words of the will lead to such a construction, but it is difficult to see how a "partition" could be made without a sale and a division of the proceeds; the main object of the testator was to provide an income for his widow during her life; and, if it should be necessary to sell during her lifetime, that is within the power of the trustees. Upon this point both parties rely upon the general doctrine of equity jurisprudence, touching this subject matter, as stated by Professor Pomeroy in his work, third volume, sections 1159, 1160: "Equity regards that as done which ought to be done. The true test in all such cases is a simple one: Has the will or deed creating the trust absolutely directed, or has the contract stipulated, that the realty should be turned into personal, or the personal estate be turned into real. The whole scope and meaning of the fundamental principle underlying the doctrine are involved in the existence of a duty. For, unless the equitable 'ought' exists there is no room for the operation of the maxim 'Equity regards that as done which ought to be done.' The rule is, therefore, firmly settled that in order to work conversion while the property is yet actually unchanged in form

there must be a clear and imperative direction in the will, deed, or settlement, or a clear imperative agreement in the contract to convert the property, that is, to sell the land for money, or to lay out the money in the purchase of the land. If the act of converting, that is, the act itself of selling the land, or of laying out the money in land, is left to the option, discretion or choice of the trustees or other parties, then no equitable conversion will take place because no duty arises to make the change, no duty to make the change rests upon them.''

It is by the law of California, and by the interpretative decisions of our supreme court, that we are to construe this will, when those decisions are sufficiently illuminative without recourse to other sources.

We have seen what the statute says: Civ. Code, sec. 1338. Its language is too clear and explicit to admit of a doubt as to its meaning. In the absence of a *direction* by the testator for a sale of the property we are not concerned with the doctrine of equitable conversion: Campbell v. Campbell, 152 Cal. 207, 92 Pac. 184. It is not to be inferred from the language employed nor from the circumstances existing at the time of the execution of the will, that the testator intended a conversion in the absence of imperative directions, expressed or necessarily implied, to the executors to sell the real estate. In the circumstances of this estate to command a sale might be to compel a sacrifice, but a discretionary power might meet the exigencies of the situation and such a power was reposed in the trustees. To work a conversion the direction to sell must be positive, irrespective of all contingencies and independent of discretion. The citations are cumulative on this point, and all tend to the same conclusion, as stated by Story: 2 Equity Jurisprudence, sec. 1214. The inclination of courts of equity upon this branch of jurisprudence is not generally to change the quality of the property, unless there is some clear intention or act by which a definite character, either as money or as land, has been unequivocally fixed upon it throughout; and if this intention do not clearly appear, the property retains its original character: Janes v. Throckmorton, 57 Cal. 382. Petitioners urge that if there be any doubt about the intention or the inter-

pretation in this respect in the mind of the court, it should be resolved in favor of trustees. But such is not the law as laid down in this state, if it be so anywhere else. All cases upon this subject recognize that conversion of real estate is not favored, and in many it is stated in so many words. The intention must be clear and the necessity absolute. A mere discretionary power of sale is not sufficient. This is the sum of all the decisions upon this proposition; but each case of this kind must stand for itself and, as has been many times said, no two are so close akin that similar cases may not be differently decided. It is as true to-day as it was over a century since, when it was remarked by Mr. Justice Washington, that it seldom happens that two cases can be found precisely alike, and that, except for the establishment of general principles, we receive little aid from adjudged cases in the construction of wills. The difficulty is in the application of these principles to a given case, and in resolving that case the judicial investigation must be limited to the terms of the testament: Estate of Granniss, 142 Cal. 1, 75 Pac. 324.

The will itself we must have constantly before us; its very words must be ever present to our physical and mental eye; it is the written law for our guidance, and from its text we may not depart with impunity. It is only in this manner and by this method that we can ascertain the intent of the testator.

Guided by the general principles of construction, and aided to such extent as we may be by authorities, we cannot find in the will of Claus Spreckels an intent to compel a conversion of his real estate into cash. There is not only no duty imposed upon the trustees in this respect, but there is an exemption from any legal obligation of making such conversion and an absolution from liability for loss by reason of the exercise of the discretion reposed in them.

### WHAT IS SOUGHT IN THIS PROCEEDING.

What is it that the petitioners seek in this proceeding? They do not demand a decree that the property be distributed to them as devisees individually, but as trustees maintaining the validity of the trust. Their prayer is that their respective shares in the property of the estate be distributed to them in

accordance with law and the provisions of the will, and that the executors be required to deliver to them the possession of the real and personal property of which distribution is sought, and that in the event that their shares in and to the whole of the property cannot be distributed to them, that their shares in and to so much of it as can be distributed be so distributed.

This prayer is comprehensive. If it be not lawful to give them what they ask, then they desire to obtain what the law may authorize the court to grant. We have already said that the will furnishes the rule for the court, and we must abide by its text and terms. The will is the immediate and proximate muniment of title; the interest to be decreed is given by that instrument, not by the formal conveyance, which is the mere conduit of transmission. The will provides, in clause (b) of paragraph second, that upon the death of the wife the trustees shall divide the estate into three equal parts, when one of said parts shall be assigned, transferred, set over and delivered by said trustees to the son Claus A., "and the same shall be and become his absolutely and forever," and another of said equal third parts to be in like manner and terms set over to Rudolph. Upon this sentence "and the same shall be and become his absolutely and forever," repeated in clause (c) and in paragraph third, the petitioners contend that testator designed to convey to them an absolute fee, notwithstanding the language of the first part of paragraph second in which he gave, devised, and bequeathed to them as "trustees" "to have and to hold the same in trust, nevertheless, for the uses and purposes, with the powers and in the manner" mentioned in clauses (a), (b) and (c). But in their petition, they ask to have the property distributed to them as *trustees;* they do not pray a distribution to them as direct devisees, but rest upon the proposition that this is a valid trust and desire a decree to that effect. In their argument, however, petitioners claim that the language imports a clear and distinct devise; that when clause (b) says that upon the death of his wife the trustees are "to divide the said estate into three equal parts" the words mean merely a direction as to what to do in the event indicated, to determine the disposition the trustees shall make; that they are not intended

to convey the title; that it was not the intention of the testator to make the trustees his conveyancers, but he intended to convey to them absolute fee, not to engage in the idle form of conveying as trustees title to themselves as individuals, but they took directly from testator, "the same shall be and become his absolutely and forever"; the testator was his own conveyancer.

### THE MANICE CASE CONSIDERED AND COMPARED.

Petitioners cite Manice v. Manice, 43 N. Y. 303, a citation also relied upon by demurrants. This is a handy case, both sides asserting that it is on "all-fours" with their respective contentions. It has been alluded to as absolute authority forty-five times in this controversy, and petitioners claim that it is to be superimposed upon the facts of the case at bar, and that the law and the facts absolutely dovetail, and that this case in that respect comes exactly within the principles laid down by the court in the Manice case, and that the language there may be applied appropriately to the situation here. In the Manice will, it is asserted in this argument, the language is very similar to the Spreckels will, "I hereby give, devise, and bequeath," in clause (b), "and the same shall be and become his absolutely and forever," in clause (c), "and the same shall be and become his or hers absolutely and forever," and like words in paragraph Third, "and the same shall be and become theirs absolutely and forever." Petitioners in argument contend that these words are apt words of devise in the will under consideration as are the words in the Manice case, and that in each instrument they were inserted for the same purpose and in each they have the same effect. In the Manice case the court said: "By reference to the language of the gifts of these shares, it will be seen that each share is given by words of present gift. In respect to the sons the words are: 'And upon the further trust to convey, transfer and pay over to my son William De Forrest Manice in fee simple, to whom I give, devise and bequeath the same, or in case of his death to his then living lawful issue, three of said equal twelfth parts.' " In the case of the son, Edward Augustus Manice, again he says: "I give, devise and bequeath" the same to him, and in case of

the trusts for the daughters again he says: "I give, devise and bequeath" to them accordingly.  And as the supreme court of New York, the court of errors, said in Hobson v. Hale, 95 N. Y. 613, in the Manice case the dispositions of the testator to his sons, and to the trustees for his daughters, proceeded by words of direct present gift, bequest and devise.

"Thus it will be seen that the testator in each case makes a present gift directly to each of his sons or their issue, and to trustees for each daughter, of a specified share of his residuary estate, to be ascertained and meted out to them respectively by the executors, pursuant to the process which he has prescribed."

In the sentence quoted the court declared that the words imported direct present gift, bequest and devise, but, as will appear by a comparison of testamentary texts, these words "give, devise, and bequeath" are not found in the same relation in the Spreckels will, and the petitioner, in qualifying his first contention as to identity of terms and tenor, says that he does not intend to claim more than that words of similar import are found in this instrument, and that he relies upon the Manice case for its principle and not necessarily for its language.  In the Manice case the court found direct devises under the words of the will.  Such words are not found here, nor can such intent be imputed to testator unless it is so clearly and unequivocally expressed that no other construction can be placed upon his language: 43 N. Y. 368.

The case of Manice v. Manice involved the construction of a long and complicated will, and it would serve no purpose, except to lengthen this opinion, to undertake to analyze it to the extent that was done in argument.  That it was difficult to deal with may be understood by quoting the remarks of Mr. Justice Sutherland, when he thought he had found finally and forever the correct interpretation:

"I think it right to say in conclusion, that this will was evidently drawn by an intelligent lawyer, who has read the statutes, and knew the meaning of words, for a persistent client, who was determined to have his own way, by paying for it; and though the examination of the questions relating to the sixteenth clause of the will has cost me some labor,

yet I have the charity to wish, that if the lawyer who penned and worded the sixteenth clause of this will should ever pen or word another like it, that it may never be his judicial duty to say whether it, or any part of it, is valid, under or by the statutes'': Manice v. Manice, 1 Lans. (N. Y.) 348, 380.

The Manice case does not aid the petitioners; its language and its principle seem to be contrary to their contention.

In the New York case there were words of direct devisa and bequest, as we have seen in the quotation; and afterward, when the trust was declared void, these words operated to vest the estate in the children. The court of final appeal declared that the testamentary trusts were not authorized by the statute, but were proper subjects of a power, ''and are not void because the testator has attempted to put them in the form of trusts, but can be executed as powers.'' Thus under the Revised Statutes of New York the testamentary intention was carried out through the artifice of a statutory ''power.'' Void as a trust, valid as a power, by virtue of the strict terms of the statute. In California the decision might have been different, for declaring the trust void, the court could not have recouped by calling it a power; because powers are no part of the statutory scheme of trusts in this state: McCurdy v. Otto, 140 Cal. 54, 73 Pac. 748.

### POWERS IN TRUST DO NOT NOW EXIST IN CALIFORNIA.

For a short period such powers existed, but the statute was repealed, and since that time a void trust may not be preserved as a power: Civ. Code, 860, 861 (see Deering's ed. 1909); Kerr's Cyc. Codes, Civ. Code, p. 782. See California Commissioners Annotated Code, 1872; Estate of Fair, 132 Cal. 557, 84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000.

Petitioners assert that the rule laid down in the Manice case is the law in California. If that be so, then, as we have seen, the citation does not serve them, because it held the trust term void, the power taking its place, and here we have no power; but the petitioners insist that the literal construction of the language in this will demands a decision in their favor; that there is no room for doubt as to what testator meant when he said that if his son should not be living at the time of his own death or that of his widow, then all the

legacies and devises given to him should go to his issue, "and the same shall be and become theirs absolutely and forever." The intention is always the guide where the words are apt. In this will, it is asserted by applicants that the language clearly indicates the intent of the testator; if the son should die without descendants there is no substitution; it is only in the event of leaving issue in the contingency provided in the instrument that there is a substitution; otherwise it remains in the estate. It is claimed that the testator intended that the sons should take title before any partition; and, if he intended that his estate should vest in his sons at the time of his death or at the time of the death of his widow, then he could not have intended that they would take title only under a partition. Numerous cases and text-books are cited to support these propositions; but they are all reducible to the one formula, that it is an established rule that his words must determine his intent. He did not devise and bequeath by apt words directly to his sons individually, but he gave to them as trustees, "in trust," for certain purposes, and, in a certain contingency "to divide" the estate so given into parts each to be by them as such trustees, "assigned, transferred, set over, and delivered" to each of themselves individually.

This is the language of the will. Is it to be taken literally? "To divide the estate into three equal parts." Petitioners assert that it is absurd to contend that he intended that the estate should be physically partitioned, there was no such idea in the mind of testator; that it is inconceivable that he contemplated such a contingency; it would be unreasonable and impracticable; not only unreasonable but unlawful; that he could not make his trustees do this and at the same time carry a valid trust because of the relation in which they would be placed with respect to the beneficiary under the remaining trust; such a project could not have been accomplished; there is no trust beyond life of widow; the vesting of title in the two sons was not dependent upon any other event than the death of widow, at which time, "then," the title in the sons became complete *as a devise;* that there was no intestacy possible in the mind of testator, that this is clear from the language employed by him, it was plainly his pur-

pose that the title should vest in his two sons immediately upon his own death; they took a vested remainder, not a contingent remainder; nor "a contingent equity to enforce a performance of the trust"; no such construction is reasonable and will not be maintained unless the court is constrained thereto; the testator never intended to create a trust, but to devise absolutely to the two sons here petitioning: Estate of Fair, 132 Cal. 529, 84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000.

It is persisted by petitioners that the testator never intended to create a trust, but to make to them individually an absolute devise, and it is repeated that it would be absurd, unreasonable, impracticable, and unlawful, that he should at the same time make them trustees and beneficiaries, notwithstanding what he says, in the language quoted. It is certainly not unlawful, even under some of the authorities cited by petitioners: Lewin on Trusts; Perry on Trusts.

Our own supreme court, in a very recent case—Cahlan v. Bank of Lassen County (Cal. App.), 105 Pac. 765—decided October 22, 1909, decided that even a beneficiary might be made trustee of the fund created for his own benefit, and cited Nellis v. Rickard, 133 Cal. 617, 85 Am. St. Rep. 227, 66 Pac. 32; which said that it is undoubtedly true, as a general proposition, that where an equitable estate and a legal estate meet in the same person, the former is merged in the latter, if the two estates are commensurate and coextensive, and if the merger is not contrary to the intention of the parties: Lewin on Trusts, 14, 665; Perry on Trusts, secs. 13, 347. And, ordinarily, a cestui que trust should not be appointed trustee. But the authorities hold that a cestui que trust is not absolutely incapacitated from being a trustee, "as the court itself, under special circumstances appoints a cestui que trust a trustee. The question is one merely of relative fitness": Lewin on Trusts, 665; Perry on Trusts, secs. 59, 297, and cases cited; Tyler v. Marye, 95 Cal. 160, 27 Pac. 160, 30 Pac. 196, where a trustee was also a beneficiary. It was contended that there could be no merger in that case because the beneficiary took no interest, the entire legal and equitable estate passing to the trustee, the beneficiary having only the right to have the trust enforced (In re Walkerly, 108 Cal.

627, 49 Am. St. Rep. 97, 41 Pac. 772) ; but the court said that it was not necessary to decide that point; and it is inferred that it was not necessary so to decide because there was no absolute or intrinsic impossibility or impracticability in the beneficiary and the trustee being the same person.

The Civil Code says that technical words are not necessary to give effect to any species of disposition by a will, and that the term "heirs," or other words of inheritance, are not requisite to devise a fee, and a devise of real property passes all the estate of the testator, unless otherwise limited: Civ. Code, secs. 1072, 1328, 1329.

### MEANING OF THE WORD "TRANSFER."

Particular attention is directed to the Estate of Dunphy, 147 Cal. 95, 81 Pac. 315, in which it is said that the word "transfer" does not necessarily import a passing of title to land by a trustee's conveyance, and that it would not have that meaning even if there had been a direction to the trustees to transfer; and the words "shall be paid," while inapt as applied to real property, simply mean, unless we are to defeat the testator's will by holding them to have no meaning, that the property is devised to the remaindermen.

In the same case, the Estate of Dunphy, Mr. Justice McFarland said:

"The principal contention of appellant is, that by this will the testator undertook to create an invalid trust to convey real property to beneficiaries; that its terms are in this regard substantially the same as those of the attempted trust which was held void in the Estate of Fair, 132 Cal. 533, 84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000, and that the said Fair case is determinative of the question here under discussion in favor of appellant. We do not think that this contention is maintainable.

"Now, in the Fair case it was held by the court that the testator devised all his property to his trustees and provided no way by which it could vest in any other person except by a conveyance of said trustees, and moreover, clearly expressed his intent that it should so vest only by a conveyance by the trustees. The only words used on the subject in that will constituted express directions to the trustees to 'transfer

and convey.' That express direction was used many times, and, in the opinion of the majority of the court, the will contained no language that could possibly be construed into a direct devise to the beneficiaries or any intent to make such devise, and that, on the contrary, it clearly appeared that he did not intend to make such a devise, but did intend that no title should pass to a third person except by a conveyance by the trustees.''

Petitioners contend that this language supports their proposition that the testator by the use of the expressions had but one design in mind; that the meaning of the words was clear and applicable to only one idea, that of an absolute devise to his sons to take effect in a certain event, and that it was never intended by them to create a trust. The construction contended for by demurrants demands that before Claus and Rudolph can take title to the property they must do so as trustees and divide into three equal parts and must assign, transfer, set over, and deliver two of these parts to themselves. Such a construction as this, assert petitioners, will not be adopted by the court, if any other consistent with testacy can be placed upon it. In this case, it is claimed, everything conspires to the conclusion that it was *not* the testator's intention that the estate should go to the sons by way of trust; and it is just exactly the converse of the situation in the Fair case, where the court found that everything pointed to the fact that it was the testator's intention that the property should go to the persons designated, but by way of trust. Upon this point petitioners are very emphatic, and it is worth while to dwell upon the matter, because the Estate of Fair seems to be considered as the leading authority. Petitioners assert that there is as much difference between the two cases as there is between daylight and darkness, and that one is diametrically the opposite to the other; that they are antipodal; that the expressions used in the Fair case do not import a direct devise, and that in the Spreckels case the words used can have no other meaning. On the other hand, it is claimed with confidence that the Spreckels trust is governed by the decision in the Estate of Fair.

In respect to the use of the word "transfer," the Estate of Peabody, 154 Cal. 173, 97 Pac. 184, is cited to show the sense

in which the word is used, but it is sufficient to say of that case that the will was that of a person unfamiliar with technical terms, and unacquainted with the technical sense. It was within the rule of the statute which says that technical words in the statute are to be taken in their technical sense, unless the context clearly indicates a contrary intention, or unless it satisfactorily appears that the will was drawn solely by the testator, and that he was unacquainted with such technical sense: Civ. Code, sec. 1327. In the Peabody case such was the showing, and, hence, it does not apply where the circumstances are contrary.

As to the meaning of terms we are cited to the common dictionaries. Webster defines "transfer," as a *noun,* "the conveyance of right, title or property, either real or personal, from one person to another, either by sale, by gift, or otherwise."

The Century defines "transfer," verb, "to *convey* as a right from one person to another"; as a noun, "the conveyance of right, title, or property, either real or personal, from one person to another, either by sale, by gift, or otherwise. In law it usually implies something more than a delivery of possession. *Transfer* in English law corresponds to *conveyance* in Scots law, but the particular forms and modes under the two systems differ very materially." In the same dictionary we find the word "convey" defined, *"in law,"* to transfer; pass the title to by deed, assignment, or otherwise; as to *convey* lands to a purchaser by bargain and sale. The word "conveyance" is likewise defined: (a) *In law,* the act of transferring property from one person, as by lease and release, bargain and sale; *transfer;* (b) the instrument or document by which property is *transferred* from one person to another; specifically a written instrument *transferring* the ownership of real property between living persons.

In the proposed New York Civil Code, chapter 2, is headed "Transfer of Real Property." Article 1 speaks of "mode of transfer"; section 483 treats of "requisites to *convey* certain estates"': "An estate in real property, other than an estate at will or for a term not exceeding one year, can be transferred only by operation of law, or by an instrument in writing, subscribed by the party disposing of the same, or by

his agent, thereunto authorized by writing'': 2 Rev. Stats. 134, sec. 6.

In the Peabody case, Mr. Justice Shaw said that outside of this state it cannot be said to have a well-defined legal meaning, especially when used as a *verb*. But within this state we find its definition in the Civil Code.

"Transfer is an act of the parties, or of the law, by which the title to property is conveyed from one living person to another'': Civ. Code, sec. 1039.

"Property of any kind may be transferred, except as otherwise provided by this article'': Civ. Code, sec. 1044.

"Grant," "conveyance," or "bill of sale'': Civ. Code, sec. 1053.

Redelivery of real property: Civ. Code, sec. 1058.

Transfer used as the synonym of convey.

In this section the statute seems to assume retransfer as the synonym of reconvey.

Mode of transfer of real property: "An estate in real property, other than an estate at will or for a term not exceeding one year, can be transferred only by operation of law, or by an instrument in writing, subscribed by the party disposing of the same, or by his agent thereunto authorized by writing'': Civ. Code, sec. 1091.

Effect of transfer: "A grant made by the owner of an estate for life or years, purporting to transfer a greater estate than he could lawfully transfer, does not work a forfeiture of his estate, but passes to the grantee all the estate which the grantor could lawfully transfer'': Civ. Code, sec. 1108.

"Where a grant is made upon condition subsequent and is subsequently defeated by the nonperformance of the condition, the person otherwise entitled to hold under the grant must reconvey the property to the grantor or his successors, by grant, duly acknowledged for record'': Civ. Code, sec. 1109.

Recording transfers of real property: "Any instrument or judgment affecting the title to or possession of real property may be recorded under this chapter'': Civ. Code, sec. 1158.

Under this head: "Every conveyance of real property acknowledged or proved and certified and recorded as prescribed by law from the time it is filed with the recorder for

record is constructive notice of the contents thereof to subsequent purchasers and mortgagees; and a certified copy of any such recorded conveyance may be recorded in any other county, and when so recorded the record thereof shall have the same force and effect as though it was the original conveyance, and where such original conveyance has been recorded in any county wherein the property therein mentioned is not situated a certified copy of such recorded conveyance may be recorded in the county where such property is situated with the same force and effect as if the original conveyance had been recorded in such county": Civ. Code, sec. 1213.

Unlawful transfers: "Every instrument, other than a will, affecting an estate in real property, including every charge upon real property, or upon its rents or profits, made with intent to defraud prior or subsequent purchasers thereof, or encumbrancers thereon, is void as against every purchaser or encumbrancer, for value, of the same property, or the rents or profits thereof": Civ. Code, sec. 1227.

Now, what does all this mean?

It means simply that whatever the mode, by succession, by will, or by deed, the title is transmitted. Future interests pass by succession, will, and transfer, in the same manner as present interests: Civ. Code, sec. 699.

What is a joint interest? It is one owned by several persons in equal shares, by a title created by a single will or transfer, when expressly declared in the will or transfer to be a joint tenancy, or when granted or devised to executors or trustees as joint tenants: Civ. Code, sec. 683.

When is a trust presumed?

"When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made": Civ. Code, sec. 853.

In section 863, Civil Code, it is prescribed that, except as afterward otherwise provided, every express trust in real property, valid as such in its creation, vests the whole estate in the trustees, subject only to the execution of the trust. The beneficiaries take no estate or interest in the property, but may enforce the performance of the trust; notwithstanding

this, the author of a trust may, in its creation, prescribe to whom the real property to which the trust relates shall belong, in the event of the failure or termination of the trust, and may transfer or devise such property, subject to the execution of the trust: Civ. Code, sec. 864.

Thus it should seem that in California the term "transfer" has an application to the transmission of title to real property.

### THE WORD "TRANSFER" APPROPRIATELY APPLIED.

It would seem from the instances cited from the statutes that the word "transfer" has an appropriate application to the transmission of title to real estate, and the citations from other states seem to reinforce this inference. In Thompson's Estate, 1 N. Y. Supp. 215, the court said: "A power of sale with respect to his real estate, discretionary in form, was given to the executors. This clause, taken in connection with the other dispositions of the will, evinces no design on the part of the testator to have his real estate absolutely converted into money, either upon the discontinuance of the trust created for the widow, or upon the son reaching majority, when the trust instituted for his benefit would end. The terms 'to pay' and 'deliver over,' used in the clause referred to, are more appropriately applied to a disposition of personal estate, and would ordinarily have some influence in determining whether or not that is the character of the fund which the testator intends the beneficiary should receive. Here, however, the testator has also used the term 'transfer,' and obviously, I think, with reference to the real estate mentioned in the clause, and to evidence a purpose to have his real estate, or such part of it as it might be possible to transfer to his son in specie, so transferred to him, and to preclude the notion that he intended, at all events and under all circumstances, to have it converted into money."

In a New Jersey case, Lembeck v. Kelly, 63 N. J. Eq. 408, 51 Atl. 794, there is this observation: "It is urged that the revision of 1898 is confined in its scope, by its title—'An act respecting conveyances'—to that class of written instruments known in legal language as 'conveyances,' and that assignments of leases of land are not included therein. But a perusal of the act will show that this construction, if adopted,

is most destructive in its consequences. Granting, for argument's sake, however, that it must be confined to conveyances of land, I think that an instrument which 'transfers' an interest in land 'conveys' such interest, and that it matters not how small in quantity and how short in time of duration that interest may be.''

In Whalon v. North Platte Canal Co., 11 Wyo. 347, 71 Pac. 995, it was declared that ''No prescribed form of words is essential to convey real estate; but the instrument must contain sufficient words to show an intention to convey.

''In one of the instruments the operative words used are, transfer, sell, release. In the others, 'transfer, sell, assign and set over.' These words are sufficient in the case of each instrument to constitute a conveyance. They show an intention to sell and transfer. The words 'transfer' and 'sell' are employed in each instrument. We think it clear that the instruments are sufficient and operative to convey the interest and title of the grantors to the water right described.''

In a Colorado case the court observed that the word ''convey,'' or ''assign,'' or ''transfer'' might be sufficient to operate a grant. Any one of these words showing intention to convey would be sufficient: Leadville v. Coronado Min. Co., 29 Colo. 34, 67 Pac. 289.

In Utah the supreme court declared that ''Contracts of sale, before being such, must contain mutual obligations of full payment and absolute conveyance. Consequently the only inquiry is as to the meaning of the word 'transfer' in this lease. The word 'transfer' may mean either a conveyance of title or merely a delivery of possession; and, if the construction of a written contract is questioned, we must look to the document itself, to the entire transaction and the surrounding circumstances, to ascertain the true intent of the parties.

''We think that, considering all the circumstances of this case and the document itself, the word 'transfer' was used in its ordinary sense as applicable to real property. When used in that connection, the word 'transfer,' unless otherwise restrained or limited, is either synonymous with the word 'sale,' or it imports something more than or subsequent to sale; selling being but one mode of transferring property. Property may be voluntarily transferred from one person to another by

sale or gift, or it may be voluntarily transferred by operation of law. In this case we are of the opinion that the reasonable construction to be placed upon the word 'transfer' is that of a transfer of title rather than a mere transfer of possession'': Ober v. Schenck, 23 Utah, 619, 65 Pac. 1073.

In Oregon in the case of Lambert v. Smith, 9 Or. 193, the court said: "What, then, is to be done with the word 'convey,' and is it the equivalent of grant? In a conveyance the word 'convey' means to transfer the title of property: Burrill's Dictionary. And in Edelman v. Yeakel, 27 Pa. 27, Judge Black says: 'The word "convey" means to transfer title from one person to another.' This is giving the same legal effect to the word 'convey' as 'grant' which has 'become a generic term, applicable to the transfer of all classes of real property.'

"In New York the operative word of conveyance is 'grant'; but Chancellor Kent says: 'As other modes of conveyance operate equally as grants, any words showing the intention of the parties would be sufficient,' and in the note it is said that the word 'convey,' or the word 'transfer,' would probably be sufficient; that is, as we understand, would have the force and effect of 'grant.' "

Chaplin on Express Trusts says: "In construing both deeds and wills and all instruments creating, transferring, assigning or surrendering, or authorizing the creation, transfer, assignment or surrender of any estate or interest in lands, the intent, as gathered from the entire instrument, controls.

"A transfer by covenant to stand seised to uses, which method of conveying the legal estate will be hereafter explained, required a deed for the raising of a use or trust."

Reeves on Real Property uses this language in sections 311, 318: "And it seems to be safe to assert, though upon no direct authority, that a writing was necessary to the declaration of a trust in incorporeal hereditaments, because the creation and transfer of legal estates in them must be by deed or grant."

Throughout his book he uses the word "transfer" in the same way.

So it should seem from all these citations of codes and cases and text-books that the word "transfer," equally with the

word "convey," is of equivalent signification and effect to "grant."

### THE FAIR CASE PARALLEL.

In the Fair case a trust to convey was held to be void. The language of that will was "in trust to transfer and convey." In the argument of the case under consideration, the petitioners drew a parallel of the alternative provisions in these two cases, as follows:

| *FAIR CASE.* | *SPRECKELS CASE.* |
|---|---|
| (132 Cal. 526, 84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000.) | |
| In case either of my daughters die leaving no children or descendants, the one-fourth part of | If my said son Claus A. Spreckels shall not be living at the time of my death or surviving me be not living at the time of my wife's death, then |
| SAID TRUST PROPERTY AND ESTATE HEREIN DIRECTED TO BE TRANS-FERRED AND CONVEYED to her children or descendants | ALL THE LEGACIES AND DEVISES GIVEN to him BY THIS WILL |
| SHALL BE TRANS-FERRED AND CON-VEYED TO the children or descendants of my other daughter and if there be none | SHALL GO TO his issue, to him in lawful wedlock born, share and share alike and |
| THE SAME SHALL BE TRANSFERRED AND CONVEYED to my brothers and sisters, etc. | THE SAME SHALL BE AND BECOME THEIRS ABSOLUTELY AND FOR-EVER. |

It is argued from the fact that these words "transfer" and "convey" or "shall be transferred and conveyed" were the only words that were found in that will by which title could have passed, that it could not be passed in any other way, and that that distinction was important in the mind of the court as decisive of that case; and since in this will there is no trust to "convey," the word not being used, as seen

above, nor any other word of identical import, therefore, there is no direction, nor even an implication, that the trustees are to "convey" or give title. Further the petitioners contend, in commenting on the Fair case, that there is not a single word in the Spreckels will, with respect to the duties of the trustees that, properly construed, can be said to require that the title should be given by the trustees to the persons who are to take the title on the expiration of the prior trust; the only words, it is asserted, that can be seized upon as implying this are the words "to divide" and the directions to "assign, transfer, set over, and deliver," in clause (b) and these words have no such just implication; they cannot be fairly construed as demanding that the title pass only through the trustees, but may be interpreted as words of direct devise.

Again, in the Fair case, attention is called to the language found on page 529 (132 Cal., 84 Am. St. Rep. 70, 60 Pac. 442; 64 Pac. 1000), where the court said that the case would have been different if there had been an independent devise followed by a direction to the trustees to convey to the devisees, in which case the words of devise would have created an estate and the conveyance would have been unnecessary, except, perhaps, as convenient and additional evidence of title; and, further, the court said that, of course, the precise technical word "devise" is not necessary; any other word or language expressive of the same action or design would be sufficient, but in the Fair will there was no such language, it was barren of any words of direct devise, for not even by a slip of the pen was Fair betrayed into using any language that might be construed into a direct devise, as, for instance, that the property should "go to," or "belong to," or "vest in" the classes of persons enumerated. It is contended that words of the same legal effect as those mentioned by the court in the Fair case, as words that would have been sufficient words of devise, in fact some of the very words that are so specified, are found in the will here under construction. It is further contended that there are clear words of direct devise used in the Spreckels will, and that the language of the third paragraph is plain, and if we take the second and construe it with the third paragraph, we find an undoubted devise to the two sons.

### DOMINANT AUTHORITIES IN CALIFORNIA.

The case of How v. Waldron, 98 Mass. 281, is cited as holding in effect that a direction to divide property among children worked a direct devise to them; but we are called back to California to find the dominant authorities upon this point. In the Estate of Dunphy, 147 Cal. 95, 81 Pac. 315, the court held that there was no trust to convey under the language of the will. The testator in that case devised his estate to his wife and daughter in trust; to convert his personal property in the county of Monterey, and also all of his real property and personal property in the state of Nevada, into cash, and to divide the net income into five equal parts; one-fifth of the net income thereof was to be paid quarterly to his wife, during her life, and upon her death one-fifth of the principal of his said estate shall be transferred and distributed as she may by will direct; if she shall make no direction, the one-fifth was to go to his heirs at law; similarly as to his daughter, Jennie C. Dunphy, he directed that one-fifth of the income should be paid to her during her lifetime annually, and upon her death one-fifth of his estate was to be distributed as by her directed, and if she shall make no such direction it shall go to her children, and if she shall leave no child it shall go to testator's heirs at law; and in the case of James C. Dunphy, he directed that one-fifth of the income should go to him for life, and that upon his death one-fifth of the principal of his estate shall be paid as he shall by will direct; if he shall have made no such direction then such one-fifth shall go to his children, and if he shall leave no child then it shall go to testator's heirs at law. In regard to his other daughter, Mary Flood, there was no question about there being a direct devise; it was simply a direction to pay the income to her during life, and after her death it was to go to her children, but if she left no children then to testator's heirs. Similarly as to the granddaughter, Viola Percy, there was no question there of any trust; it was simply a direct devise.

It was held that the will should not be held to create an unwarranted trust to convey unless its language clearly showed that there is an intent to create such a trust and it could not be reasonably construed otherwise. But the court held that the only trust created by Mr. Dunphy was a trust

during the lives of his wife and children, and that after the death of the wife and these children, in each case, the trust purpose ceased, and the property was left in the hands of the trustees and, of course, it had to be distributed to get it out of their hands.

In the Estate of Heywood, 148 Cal. 184, 82 Pac. 755, the testator created a trust for the life of his wife from whom he was separated by articles of agreement, and he was bound under this agreement to pay her a certain sum of money during her life, and he created a trust during her life to provide for such payment, providing in the will that at the end of the trust estate, that is, upon the death of the widow, one-half of his property vested absolutely in his daughter; and upon the same event, also, the other half vested absolutely in his brothers and sisters and their issue.

The language is: "Upon the death of my wife one-half of the residue of my estate shall vest absolutely in my said daughter and the remaining one-half shall vest absolutely, as follows, to wit"—enumerating the persons in whom it is to vest.

The controversy in the Heywood case arose over the clause of the paragraph of his will, called clause 4, in which he said: "In case my said daughter should die before my said wife, without any child or children, then the whole of said residue shall be divided among my said brothers and sisters, and niece and nephew, in the proportions named in the last preceding subdivision."

It was claimed that those words created a trust to convey, in line with the Estate of Fair, and therefore that the whole will must fall.

It was held that the trust was not invalid, and that the principle of the decision in the Fair case had no application, because the provision of the Heywood will was radically different from the provisions construed in the Fair will. . It did not provide that trustees should transfer or convey the trust property to the relatives designated as the only method whereby title to the trust property should pass to them should the specified contingency occur; in fact, no active duty was cast upon them in this regard; they were not mentioned in the

section; there was no express direction to them to "divide" the trust property; nor was there any direction in any other provision of the will that they should make any transfer, conveyance, or division of the trust estate among the beneficiaries, or that they should do anything at all so as to vest title to it in them. In this respect the Heywood case should seem to be the antithesis of the Spreckels will, in which, according to his words, the testator contemplated that the division should take place through the trust.

In commenting on the Estate of Dunphy, Mr. Justice Lorigan said: "In that case a trust clause in the will provided that upon the death of one of the beneficiaries one-fifth of the principal of the estate 'shall be transferred and distributed' as such beneficiary might by will direct. There was no express direction to the trustees to transfer or distribute. It was insisted that the language used meant that the title to such fifth could only pass by the trustee's conveyance, and that it was a trust to convey and void under the decision in the Fair case. This court held otherwise, and declared the provision valid, holding that the use of these words evidenced no intention that the trustees should execute a conveyance, and that the provision contained no direction at all to the trustees to transfer, distribute or convey, nor did it interfere with the apparent intention of the testator that the disposition of the trust estate authorized by the beneficiary to be made should operate as a direct devise. As the direction in the Dunphy case that a portion of the trust estate 'shall be transferred and distributed' did not amount to a trust to convey, but operated as a direct devise, certainly the provision in the present trust that the 'whole of said residue shall be divided' did not create a trust directing the trustees to divide or transfer the title by conveyance on partition, but operated as a direct devise in favor of beneficiaries. We are satisfied that it was the intention of the testator, in using the language in subdivision 4 that the 'whole of said residue shall be divided,' to indicate the persons and proportions in which, in the event of his daughter's death, the share otherwise absolutely devised to her should vest, and that no trust of any kind was imposed upon the trustees under said provision."

It is contended by demurrants that this decision is authority for two propositions in the case at bar: (1) that *a trust to divide* is an invalid trust under section 857 of the Civil Code:

"Express trusts may be created for any of the following purposes:

"One.  To sell real property, and apply or dispose of the proceeds in accordance with the instrument creating the trust.

"Two.  To mortgage or lease real property for the benefit of annuitants or other legatees, or for the purpose of satisfying any charge thereon.

"Three.  To receive the rents and profits of real property, and pay them to or apply them to the use of any person, whether ascertained at the time of the creation of the trust or not, for himself or for his family, during the life of such person, or for any shorter term, subject to the rules of title two of this part; or,

"Four.  To receive the rents and profits of real property, and to accumulate the same for the purposes and within the limits prescribed by the same title";

—and (2) that where there is a substantial legacy, or a legacy giving a substitutional devise, that it is the same as the original devise, which goes to the substituted devisee.

In the Estate of Heberle, 153 Cal. 275, 95 Pac. 41, decided March 24, 1908, which is much counted on by both sides, the trust was conceded to be void under the decision in the Fair case, but by reason of words of direct devise in other parts of the will the property passed to the beneficiaries.

The only question in that case was whether or not from a construction of the will intestacy resulted. It was an appeal from an order sustaining demurrers to the petition of heirs at law of a portion of the estate, it being the contention of petitioners that as to this portion he died intestate. The court said:

"The deceased by his will, after directing the payment of his debts and funeral expenses, devised and bequeathed to trustees all the rest and residue of his estate upon specified trusts.  By the seventh paragraph of his will he directed certain real property upon Spring street in the city of Los

Angeles, called for convenience the Spring street property, of the estimated value of sixty-five thousand dollars, to be held by the trustees for the term of five years 'and then the same by said trustees to be conveyed to the children of my deceased brother Martin Heberle, late of Miamisburg, Montgomery county, state of Ohio, share and share alike.' It is conceded by all parties to this litigation that this trust is void: Estate of Walkerly, 108 Cal. 628, 49 Am. St. Rep. 97, 41 Pac. 772; Estate of Cavarly, 119 Cal. 408, 51 Pac. 629; Estate of Fair, 132 Cal. 523, 84 Am. St. Rep. 70, 60 Pac. 442, 6 Pac. 1000; Estate of Dixon, 143 Cal. 511, 77 Pac. 412; Estate of Sanford, 136 Cal. 97, 68 Pac. 494. At the time of his death, the testator still owned the Spring street property. The question to be answered is what disposition is to be made of it. Admittedly, if intestacy results as to this property, the petitioners are entitled to share in it.

"Reading the whole will, we find, next, this clause: 'In case I should dispose of said property, then it is my will that my trustees pay over to the said children or grandchildren of my said deceased brother the amount received by me for said property. It being my will that the said children and grandchildren of my deceased brother shall receive from my estate the said real estate or its value.' By the fourteenth paragraph the testator empowers the trustees to convert real estate into money by sale. The seventeenth paragraph, however, is a limitation of this general power, and reads as follows: 'That the power to sell my real estate, as set forth in the fourteenth subdivision, shall not affect my said Spring street property, which is not to be sold, but is to be kept and distributed to the children of my said deceased brother, Martin.' The trust created by paragraph 7 being void in its creation, no estate as to the Spring street property passed to the trustees. If in the will there are no other apt words disposing of the property upon the failure of this trust, intestacy as to it must be the result. The trial court found those words in the seventeenth subdivision of the will above quoted, and in view of the fact that *a construction* which favors testacy is always preferred to one resulting in intestacy (Dunphy's Estate, 147 Cal. 96, 81 Pac. 315), it may not be said that the

interpretation is not a permissible one. The seventeenth paragraph contains a direction for the 'distribution' of the Spring street property to the children and grandchildren. While it may be argued that the word has reference to distribution by the trustees under the trust, yet it is not a word aptly used for such purpose, while it is apt in its application to a direct devise. It is equally open to the construction, therefore, that the distribution to the children is to be at the hands of the court. As is said in Estate of Dunphy, 147 Cal. 96, 81 Pac. 315, the word 'distributed' is not a technical word in conveyancing and is not usually found in deeds. 'If it have any legal technical meaning it has such meaning with reference to decrees of distribution in probate courts.' It appears that while the testator designed, in case he died possessed of the Spring street property, that that property should be held for five years, yet that if the Spring street property had been sold, they were to receive in money the amount obtained from such sale directly, and not through the medium of trustees. The paramount idea in the testator's mind, therefore, was not that the property should descend to his beneficiaries through a trust, but that, with or without a trust, they should with certainty receive property to that value from his estate. Under the wording of this instrument, therefore, the trial court was correct in holding that its conclusion that the trust was void did not, in contemplation of the other language employed in the will, so defeat the testator's intent as to render imperative a finding of intestacy."

I have deemed it proper, at the expense of space, to present this opinion in full, on account of the importance attached to its expressions. Petitioners ask particular attention to this case because of the reason that it goes far from the Fair case. The language that the court below and that the appellate tribunal found as sufficient to operate as words of devise there was "the power to sell my real estate as set forth in the fourteenth subdivision shall not affect my Spring street property, which is not to be sold, but which is to be kept and distributed to the children of my deceased brother, Martin."

### THE PARAMOUNT IDEA OF TESTATOR.

The court said that the paramount idea in the mind of the testator was *not* that the property should descend to his beneficiaries through a trust, but that with or without a trust the designated persons should with certainty receive property to that value from his estate. Is not that the paramount idea? Is it not obvious from every part of the will at bar, from the words of exclusion as well as from the words of inclusion, that Claus A. and Rudolph Spreckels are to receive this estate, and that the other sons are to receive nothing?

Petitioners submit that this Estate of Heberle is alone ample justification for their position, and that it is sufficient to justify this court in sustaining their contention without any other case at all; and they call attention to the fact that it was there necessary to disregard a part of the language, namely, that which under the rule in the Fair case became ineffective—the trust to convey—and also to carry out the intent of the testator the court took other language designed for another purpose and construed it as language of devise. This language, which petitioners say perplexes demurrants, is where the testator said: "In case I should dispose of said property, then it is my will that my trustees pay over to the said children or grandchildren of my said deceased brother the amount received by me for said property. It being my will that the said children and grandchildren of my deceased brother shall receive from my estate the said real estate or its value."

This was not the provision upon which the court below based its decision sustaining the limitation in favor of Martin Heberle's children. The opinion proceeds: "By the fourteenth paragraph the testator empowers the trustees to convert real estate into money by sale. The seventeenth paragraph, however, is a limitation of this general power, and reads as follows: 'That the power to sell my real estate, as set forth in the fourteenth subdivision, shall not affect my said Spring street property, which is not to be sold, but is to be kept and distributed to the children of my said deceased brother, Martin.'"

But it is difficult to accept the conclusion of petitioners that this Heberle case is sufficient to support their proposition.

The important question in the cited case was the sufficiency of a disposition as obnoxious to the doctrine of trusts to convey and the court held that while the dispositive provision was void under the Fair case it might be maintained as a direct devise. "The seventeenth paragraph," said the court, "contains a direction for the *distribution* of the Spring street property to the children and grandchildren. While it may be argued that the word has reference to distribution by the trustees under the trust, yet it is not a word aptly used for such purpose, while it is apt in its application to a direct devise. It is equally open to the construction, therefore, that the distribution to the children is to be at the hands of the court. As said in Estate of Dunphy, 147 Cal. 96, 81 Pac. 315, the word '*distributed*' is not a technical word in conveyancing and is not usually found in deeds. If it have any legal technical meaning it has such meaning with reference to decrees of distribution in probate courts."

"It appears that," says the court, "while the testator designed in case he died possessed of the Spring street property, that that property should be held for five years, yet that if the Spring street property had been sold they were to receive in money the amount obtained from such sale directly, and NOT THROUGH THE MEDIUM OF TRUSTEES."

These last words point the distinction between the two cases.

Petitioners say that the purpose of the testator was to create a trust for the widow and daughter, and after that a devise for the two sons, who take as primary devisees, their title vesting immediately upon the death of testator; it is repeated that it is clear upon principle and authority that testator designed a devise. We have here two valid trusts (a) (c), one for the widow, one for the daughter, remainder a devise to sons. It was not upon a partition that the title was to vest, but upon the death of the testator to take effect in the events indicated in paragraph second of will; and absolute vesting of title in the two sons upon the death of testator, postponement of possession only.

### WHAT IS MEANT BY TERMS "DEVISE" AND "LEGACY."

Now, we recur to legal terminology. We have considered the meaning of the word "transfer" and its synonymity with

the word "convey," the former a most comprehensive term applying to real and personal property, the latter only to real property, but, of course, included in the former, and the word "assign," peculiar to personal property, meaning according to the Century Dictionary "to set apart; to make over by delivery or appropriation; apportion, or allot."

We come, then, in natural sequence, to ascertain what is meant by the terms "devise" and "legacy" and their cognates.

The word "transfer" in this will is not isolated; it is associated with other words of legacy and devise. Testator "gives devises, and bequeaths" unto his trustees, all his estate, real, personal, and mixed, to have and to hold the same in trust, to be assigned, "transferred," set over, and delivered to his son, and so on. The word, therefore, seems to be woven in the verbal texture of legacy and devise.

The original section of the Civil Code of California differed from its present text, and from its prototype, the statute of New York, in an important particular, which was sought to be corrected by amendment in 1905, the law as it now stands.

"When any estate is devised or bequeathed to any child, or other relation of the testator, and the devisee or legatee dies before the testator, leaving lineal descendants, such descendants take the estate so given by the will, in the same manner as the devisee or legatee would have done had he survived the testator": Civ. Code, sec. 1310.

In the Estate of Ross, 140 Cal. 289, 73 Pac. 976, the court said that in the whole chapter on wills the legislature has with extreme care and technical accuracy, used the terms "devise" and "legacy" in their well-recognized common-law sense and distinction; the one as a testamentary disposition of land, the other a like disposition of personalty. And, to accentuate the proposition that the term "devise" is technically used, it is provided by section 1343 of the same code that: "If a devisee or legatee dies during the lifetime of a testator, the testamentary disposition to him fails, unless an intention appears to substitute some other in his place, except as provided in section 1310." It is obvious that the terms "devisee" and "legatee" are used in this section with legal accuracy and distinctiveness, and with the same accuracy the exception is

limited in section 1310 to a devise. In that case the supreme court dealt with section 1310 as it stood prior to the amendment of 1905, and it is with reference to its then terms that the court remarked that under section 1343 all devises or legacies lapse, if the devisee or legatee dies before the testator, except as protected and secured by section 1310 to the lineal descendants of any child, or other relation of the testator. This protection, however, by the explicit language of section 1310, is extended solely to devises; legacies are not within its terms. The use of these terms, "devise" and "devisee," "legacy" and "legatee," all through this chapter, with legal exactness, exhibits the intention of the legislature to employ them precisely as defined at common law. Where clear, direct and explicit terms are used by the legislature, which have had a definite meaning since the beginning of common-law terminology, there can be no room for discussion as to their meaning. Time has marked them too distinctly not to be clearly recognized and understood. This decision was delivered in 1903; the controversy arose prior to the amendment, the lower court having decided the matter in May, 1901: 3 Cof. Pro. Dec. 500, 511.

The legislature subsequently made the distinction manifest by amendment sharply defining the difference between "devise" and "legacy," the former being confined exclusively to real and the latter to personal property.

It may be assumed that the testator, charged with a knowledge of the law, had this distinction in mind when he made his will, and that the lawyer whom he employed to mold in legal form the communicated idea of his benefaction expressed his concreted conception in the terms of this instrument, when he used the verbs "devise" and "bequeath" and the substantives "devise" and "legacy." It should seem quite clear that when the testator used these expressions he meant that the trustees were to take realty as well as personalty. As the petitioners say, every word in the will must be given full meaning.

In Thompson v. Hart, 58 App. Div. 439, 69 N. Y. Supp. 223, the court said, commenting on Delafield v. Barlow, 107 N. Y. 535, 14 N. E. 498: "In that case as here there was a devise both as to real and personal property, the directions to

divide into shares. And in this respect the cases are quite parallel; in other respects there is a radical difference. In the Delafield case the language of the gift is, 'I give and bequeath,' and the court held that this language was strictly applicable to a bequest of personal property. In the present case the language of the will is, 'I give, devise and bequeath,' language which excludes the idea that personal property only was to pass, and which is peculiarly appropriate to the character of the property which in fact passed to the trustees.''

It may be proper here to insert the syllabus of the Delafield case: ''S. died, leaving his wife and four daughters surviving him. By his will he directed his executors to divide one-half of his residuary estate, real and personal, into four equal parts, which he gave to said executors in trust to receive and apply the rents and profits to the use of the testator's wife during her life; after her death the rents and profits of said parts to the use of each of his said children during life, and upon her death 'to pay over,' transfer and deliver the principal of said one-fourth part, together with any arrears of income to her heirs, or to such person or uses as said daughter 'may by her will appoint.' The other half he directed his executors also to divide into four parts and to give one to each of the testator's said children. The will also provided that any moneys advanced to either of said children and charged in the testator's books of account against her share in the estate, should be deducted 'from the sum bequeathed to such daughter in this section.' The will also empowered the executors, 'for the purpose of carrying into effect' the will and trusts therein created, to sell 'in their discretion' any and all of the real estate. In an action for partition of certain real estate of an interest in which the testator died seised, and which was included in said residuary clause, held, that an infant child of one of the daughters was not a necessary or proper party defendant under the Code of Civil Procedure (section 1538); that she never could take the real estate, and had no title thereto, or interest therein as realty, but that the whole title vested in the executors and trustees; that, construing all the provisions of the will together, the direction to sell the real estate was *im-*

*perative* and there was, therefore, an equitable conversion thereof into personalty."

This is said by both sides to be a case precisely in point. In Scholle v. Scholle, 113 N. Y. 272, 21 N. E. 84, the court said: "It is observable that the language of the testator is very carefully employed to rebut the theory of a conversion. In each of five articles when giving income he merely uses the phrase 'I give and bequeath,' appropriate to a mere gift of personal property; but when he creates the remainders the language changes uniformly and in every instance becomes 'I give, devise and bequeath.' The change of phraseology seems not to be accidental, but intentional, and to indicate the testator's expectation that land as such would pass in the remainders and their gift required the added word devise."

It is not necessary to transcribe passages from these and other cited cases to explain repetitively that there was not here a careless or accidental use of terms, but an intelligent purpose to execute testator's intention: Matter of Coolidge, 85 App. Div. 304, 83 N. Y. Supp. 299.

While the petitioners pray as trustees for a distribution to them as such, in argument they contend that the clause under which they claim is not a valid trust, but a devise, and that the court must sustain the valid and reject the void. This is an anomaly in argument. "The purposes of the testator as outlined in clause (b) were not intended by him to be accomplished through the medium of a trust or by the intervention of trustees." "No man can be a trustee for himself": Greene v. Greene, 125 N. Y. 506, 21 Am. St. Rep. 743, 26 N. E. 739. But we have seen that in California this may be the case: Nellis v. Rickard, 133 Cal. 617, 85 Am. St. Rep. 227, 66 Pac. 32.

THE TRUSTEES TAKE THE WHOLE TITLE, LEGAL AND EQUITABLE.

It is conceded that clause (b) is bad as a trust, and we are asked to separate it from its context and make it good as a devise. We are told about the mechanism, the geography, the physiognomy and the mathematics of this instrument, and even the classics are not neglected in discussion, but we come finally to the point at which we began, What were the trust purposes under this will? They are clearly recited in that

document. All his property is given, devised and bequeathed unto his trustees, for the trust purposes indicated (a), (b), (c) in second paragraph. In this paragraph there are five trust purposes, (1) to pay income to widow, (2) to divide the property into three equal parts after her death, (3) to assign, transfer, set over and deliver one of these parts to Rudolph, when the same shall be and become his absolutely and forever, (4) a similar trust purpose as to Claus A, and (5) to hold the remaining one-third part during the life of Mrs. Emma Ferris, in trust, to pay over to her the net annual income during her life, and at her death to pay over the principal of said third part to her children or grandchildren, as the case may be, when the same shall become theirs absolutely and forever. If she should leave no child, children or grandchildren her surviving, then the trustee is to pay over the principal of said equal third part to said Claus A. Spreckels and to Rudolph Spreckels, and the same shall become theirs absolutely and forever.

Purposes 2, 3 and 4 are included in clause (b) of paragraph "Second" of the will.

It is admitted that the first trust, for the life of the widow, is valid, and does not exhaust the fee; but it is asserted by demurrants that the second and third trusts, the trust to divide the property into three equal parts, and the trust to transfer these parts, require that the full fee shall be vested in the trustees; therefore, they take the full fee as trustees. Now, if this be so, and if it be not contrary to the statutes, it is a perfect trust. It must be considered as a whole; as an entirety. We sometimes speak of "real trusts" and "personal trusts," but these phrases are not accurately descriptive. The trust operates upon a collective entity, composed of real and personal estates, but for convenience the old and familiar terms continue to be used.

That the fee was cast in the trustees, by the terms of the trust, is apparent from the provisions of the will. A trust to sell confers a fee, for if they had no fee they could convey none: Estate of Fair, 132 Cal. 549, 84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000. The sixth paragraph of the will at bar authorizes and empowers the trustees *in their discretion* to sell and dispose of any and all of testator's property, real

or personal, and to give all deeds, bills of sale, and other muniments of title expedient or necessary to purchasers. In such cases the trustees take the whole title legal and equitable.

"Except as hereinafter otherwise provided, every express trust in real property, valid as such in its creation, vests the whole estate in the trustees, subject only to the execution of the trust. The beneficiaries take no estate or interest in the property, but may enforce the performance of the trust": Civ. Code, sec. 863.

The title being in the trustees, the process of taking it from them must be by transfer to the beneficiaries; and that process is provided by the will. It is idle to say that this is absurd, to transfer from one person to himself; for it is for the court to follow the law, and the will is the law; besides, as has been shown, we must treat the trustees and beneficiaries as distinct legal entities, notwithstanding their individual identity.

The only way in which these petitioners come into possession of their parts is through the transfer from the trustees to them upon the death of the widow of testator. It is *then* only, after the division into three equal parts, that they take title "absolutely and forever." So, also, in the case of Mrs. Ferris, trustees are to pay the income to her during her life and at her death they are to pay over the principal of the remaining equal third part to her children or grandchildren, as the case may be, and in default of children or grandchildren they are to pay over the principal to Claus A. and Rudolph.

In the case of the death of either of the sons named, then all the legacies and devises "given to him by this will shall go to his issue." Neither is named as a direct devisee or legatee; each is mentioned only as a trustee, and his share comes to him testamentarily only after the death of the widow and through the medium of trustees. No title whatever vests in these beneficiaries except as a result of the transfer from the trustees. The fee remains in the trustees as such to feed the limitation to vest at the distributive epoch; it continues to abide in them until the event occurs upon which it is contingent. This is substantially the language of Savage v. Burn-

ham, 17 N. Y. 566, in unison with the Estate of Steele, 124 Cal. 539, 57 Pac. 564.

In the Estate of Dixon, 143 Cal. 513, 77 Pac. 412, the testator provided that the trustees should "pay over and transfer" to the beneficiary the trust estate with the income and the accumulations. The word "convey" does not occur in the instrument. The court said that the testatrix clearly intended the title to remain in the trustees until the termination of the trust, for she directs the trustees, upon the happening of the event, to pay over and transfer the trust estate to him. In the will at bar the testator provides that upon the division of the estate into three equal parts, one of the parts shall be assigned to Claus A. and one to Rudolph, and the same shall be and become his absolutely and forever. Until that transfer, there is no complete investiture of title. The Dixon case is authority for the proposition that until the transfer the fee abides and vests and persists in the trustees. It has been decided that under the California statute the beneficiary takes no estate except by conveyance from the trustee. The Estate of Fair is cited for the doctrine that where a testator, as in clause (b) of this will, instead of making a direct devise, makes a devise through the medium of trustees, who are to transfer, and marks the time for the vesting of the property after the division, and in consequence of the transfer, that such a dispositive attempt upon the part of a trustee is futile, that the trust is void.

### THE FAIR CASE A RULE OF PROPERTY.

Whichever way we turn we seem to be confronted with the Fair case. It has become a rule of property in this state and it is dangerous to depart from its doctrine, and it has not been departed from hitherto by our appellate court. In Keating v. Smith, 154 Cal. 186, 97 Pac. 300, there were provisions similar to the Fair will, and the court said that the original testamentary trust was invalid, but the estate had been distributed and the time for appeal had elapsed, and, therefore, no remedy remained, for the decree could not be disturbed, although the trust itself was void, and this was conceded. In that case the supreme court said the will made no direct devise to anyone but the trustees and gave to the

beneficiaries only the right to receive new estates created by the transfer from the trustee; but the decree of distribution was, for the reason stated, final. Upon a like point in Hofsas v. Cummings, 141 Cal. 527, 528, 75 Pac. 110, the court said that there appeared to have been designedly created a trust to convey, whereby the title to the property should vest, and could only vest, in Lewis upon the execution of the deed from the trustees; and, further, that in the trusts over there were apt words granting and conveying title by the act of the trustees under the instrument itself, while in the case of Lewis the only title which he was to receive was from the trustee, and none whatever from the act of the trustor.

It is asserted by petitioners that the Estate of Fair differed radically from the case at bar; in fact, that it was precisely opposite to the situation here. In that case, it is argued, there were words in the will, in addition to the direction to convey, which showed affirmatively that the testator desired the estates of the remaindermen to be taken under a conveyance from the trustees. There was the direction that the trustees should transfer and convey; here the proposition is that the property shall be divided, shall be and become absolutely and forever the property of these two sons; in the other part of the will, showing where the same property is, in a certain event, to go to other persons, it is to go to them. Certainly, it is claimed, the testator could not have intended that there must have been a trust to partition or convey in the case of his sons, but a direct devise in the case of his grandchildren. Now, what did the supreme court say in this connection in that case? It declared that the principle which the testator has clearly expressed in his will must be followed, and that the instrument cannot be construed as intending a direct devise where the clearly expressed intention is otherwise, and that there cannot be a devise without operative words sufficient to create it, as illustrated in Estate of Young, 123 Cal. 337, 55 Pac. 1011. In the same case the court said (132 Cal. 548, 84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000) that if the words "transfer and convey" were eliminated from the will, then the beneficiaries would "not take the estate at all, for the heirs of Fair would be entitled to inherit it. Hence the interest of the beneficiaries in the estate can

only come to them through the words 'transfer and convey'; and if the beneficiaries are to take the fee and take it only through the medium of these words, the trustees must have the fee vested in them, in order that they may transfer and convey it."

### WHAT THE FAIR CASE DECIDED.

These words may be adapted to the case at bar. According to this authority the trust as to real property is invalid. Many of the questions there discussed may not be essential here, but some are appropriately considered. In one particular the justices seemed to be agreed that a trust to convey in this state would be invalid. At common law such trusts were recognized, but our code provisions were designed to abolish and have abolished them. Therefore the Fair trust was declared void. In that case (132 Cal. 527, 84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000), the court said that our provisions are clearly taken from those of New York on the same subject. Section 857 of the California Civil Code is practically the same as section 55 of the Revised Statutes, the main difference being that subdivision 1 of that section merely provides for an express trust "to sell lands for the benefit of creditors," and it was held in that state, both before and after the adoption of the California codes, that there could be no express trusts as to land, except those enumerated. In Hawley v. James, 16 Wend. 147, Bronson, J., said "there can no longer be any express trusts, except such as are enumerated and defined by the statute." In Gilman v. Reddington, 24 N. Y. 15, the court say: "Trusts to convey land to a beneficiary are not enumerated in the statutes of uses and trusts"; and in Hotchkiss v. Elting, 36 Barb. 44, the court say: "The trust therein mentioned is simply to convey the premises, subject to the reservation, to such person or persons as the wife of the plaintiff should by writing appoint. This is not one of the trusts authorized by law, and is therefore absolutely void." The foregoing are merely a few of many other New York cases to the same point. The New York statutes contain provisions for "powers in trust" which are not authorized by our code.

Our supreme court further quotes from Bronson, J., in Hawley v. James, in which he said: " 'The rule that the

intent of the testator is to govern in the construction of wills has no necessary connection with the inquiry whether the devise or bequest is consistent with the rules of law. When we have ascertained what particular disposition the testator intended to make of his estate, then, and not before, the question arises whether the will is valid. If the disposition actually made is not inconsistent with the rules of law, the will is good, and must be carried into effect, whatever the testator may have thought about the legality of the act; and, on the other hand, if the disposition actually made is contrary to law, whether it happened through design or the want of accurate information, the will is worthless, and we have no choice but to declare it void.' The Fair will is clearly within these declared principles; for here the intent was clear, that the whole estate was to go to the trustees, to be by them conveyed, and there are no operative words to create an estate in remainder. Of course, if an estate be created subject to several trusts, one of which is void, and the latter is legally separable from the others, the estate vests, unaffected by the void trust; but if the creation of the estate depends upon the execution of a void trust, then it can never come into existence'': 132 Cal. 532, 84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000.

In construing the language of the will it was said in the same case it must be kept in mind that the court is not allowed to force the construction of a sentence, or even a word, in order that a particular result may be reached; and this is the rule, even though such construction be absolutely necessary to save the document from complete condemnation.

In the Walkerly case it is said: ''Where the language of the provisions of the will is plain and unambiguous, the courts are not permitted to wrest it from its natural import in order to save it from condemnation. It may be said of all wills that the testator's intent is to make a valid disposition of his property. But a court is not therefore authorized to modify or vary the plain language of the testator, and thus create a new and valid will for him, even if it were certain that the testator would have adopted the interpretation of the court, had he known his own attempt was invalid.''

Chief Justice Beatty, upon the rehearing of the Fair case, modified his original opinion and corrected his conclusion that the intent of the testator might be given effect as a direct devise. Wherever a testator attempts to convey his estate by a method clearly unlawful, the attempt must fail; in such case the intent cannot be effectuated. The chief justice became satisfied, on reflection, that the lawful intention of the testator could not be carried into effect by disregarding the unlawful means chosen by him for its accomplishment. For other reasons, however, he adhered to his original view that the trust created by Fair was valid. Mr. Justice Harrison, in the course of his dissenting opinion, said:

"It is sometimes provided in the instrument creating the trust, that after the execution of the trust specifically prescribed the trustees shall DIVIDE the trust property, and upon such DIVISION convey it to certain beneficiaries then to be ascertained. In such cases the trust is executory, and the beneficiaries take no interest in the property, except by virtue of the conveyance. The trustees are clothed with a discretionary power, which can be exercised only by themselves, or under the supervision of a court of chancery: Gilman v. Reddington, 24 N. Y. 9; Manice v. Manice, 43 N. Y. 303; Cooke v. Platt, 98 N. Y. 35; DeKay v. Irving, 5 Denio, 646. So, too, when the conveyance is to be made in accordance with the appointment of a designated beneficiary or a third person, the trustees have an active duty to perform for the purpose of completing their trust, and the author of the trust is not his own conveyancer. In the present case, however, the trustees are not directed or authorized to divide the trust property, and any attempted division by them would be in excess of their power and nugatory": 132 Cal. 565, 84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000.

It is not necessary to extract more from the opinion in this regard, as it seems to reflect the unanimous sentiment of the supreme court. In the Estate of Sanford, 136 Cal. 100, 68 Pac. 494, the court followed the principle of the Fair case.

In the Estate of Pichoir, 139 Cal. 682, 73 Pac. 606, the will contained a direction that the trustees should, upon the death of the sister of the testator, convey and pay over such of his

estate as should then be remaining in their hands unto William Mooser, or if he should not be then alive then to his wife, or if she should not be then alive then to and among his children who should then be living, to be divided among them share and share alike. The supreme court said that the will clearly contained a trust to convey all the real property of the estate to the Moosers. It had no words of devise to them. It contained neither the word "devise," nor any equivalent. If it were not for the words "trust" and "convey," there would be no operative words in the instrument by which the title to the real property would in any way pass to them; and the manner provided for the vesting of title in them being unlawful and forbidden, the real property was not disposed of by the will and vested at the death of the testator in the heir at law. The case, in this respect, the court could not distinguish from the Estate of Fair.

### THE WORDS "DIVIDE" AND "DIVISION" INTERPRETED.

In Hawley v. James, cited above, the direction was to the trustees "to divide" into so many "equal parts," and thereupon to "convey" the same to the beneficiaries. Bronson, J., considered this an obligation upon trustees to divide the estate into so many equal parts and called it a "partition," and declared it invalid.

In De Kay v. Irving, 5 Denio, 646, the direction by the testator was that at a certain time his estate should be "divided," and provisions were made for details "until the said division of my estate shall be made." "Divide" and "division" are the words. In his opinion, Beardsley, J., said that the direction in the will to make partition of the same did not require the title to be vested in the executors, as it might be done by the exercise of a naked power, and created no suspense of the power of alienation. In effect, this was to say the trust to divide was void under the statute of New York, and the judge understood by the terms "divide" and "division" a testamentary direction to make a "partition," using these words as synonyms. In commenting upon this case in Manice v. Manice, Rapallo, J., uses these words interchangeably; repeatedly in the same sense: 43 N. Y. 365, 369.

In Cooke v. Platt, 98 N. Y. 35, testator gave, devised and bequeathed to his executors all of his real and personal estate upon trust to *divide* and distribute his said estate, or its proceeds after the payment of his debts, to and among his four children, naming them, in equal proportions, the children of any deceased child to take its parent's share. The court said that it was of opinion that no trust estate in the testator's land was created in the executors of the will; that the main purpose of the testator was to give his estate remaining after payment of his debts equally to his four children. He imposed upon his executors the duty of making the division, and this was the declared purpose of the trust. If there was nothing further in the will there could be no question. The statute does not authorize the creation of a trust for the *partition* of lands.

Henderson v. Henderson, 113 N. Y. 1, 20 N. E. 814, cites and supports this case, saying that the declared purpose in that case was to *divide* the estate among the children through the executor, conferring a discretionary power to sell, and it was, therefore, ineffectual to create a valid trust, though it might be upheld as a power.

### THE PICHOIR CASE DISTINGUISHED.

If the trust as to real property becomes void, what becomes of the personalty? The rules applicable to trusts of real property are generally applied to trusts of personal property. Petitioners contend that the valid trusts may be separated from the void, and that the doctrine of severability may be invoked in this case, and that it is the proper and salutary course for the court to follow in construing the will; that the contrary contention is novel and involves a strained construction foreign to the intent of testator, and that it is the judicial duty to disregard it as tending to a defeat of his plain purpose; and that the peculiar consequences flowing from the strange and strained interpretation of demurrants forbid that their claim of inseverability should be seriously regarded, and cite the Estate of Pichoir, 139 Cal. 682, 73 Pac. 606, wherein a trust was held severed as to real and personal property.

In the Pichoir case it is pointed out by demurrants that the trustees had a mere naked trust, simply to convey the realty

and personalty in undivided shares, as in the Estate of Fair, but in the case at bar the trustees are clothed with a discretionary duty to "divide" the estate among the two sons and the daughter. In this respect the cases may be distinguished. The main trust in the Pichoir will was as to personal property, the realty was comparatively insignificant. It would seem that the trustees had no discretion in the premises. In the case at bar it is claimed to be different, and it is argued by demurrants that it is clear that the testator intended that the trustees should retain the property in its original form, as appears from the fifth paragraph in which he authorizes and empowers his trustees to invest and reinvest the trust funds in any securities approved by his wife and by them during her lifetime, in case she survive him, and after her death in any securities which the trustees may deem best, whether the same are or are not investments to which executors and trustees are by law limited in making investments, and to change or vary investments from time to time as they may deem best; and the trustees were authorized to hold and continue, in their discretion, any security in which any of the property might be found invested at the time of his death, his intent being that they should be absolved and discharged from the absolute legal duty of converting his estate into money, and that they should not be liable for any shrinkage in value by reason of the exercise of the discretion reposed in them.

### INSEVERABILITY OF THE SPRECKELS TRUST.

Now, it is claimed that we have but one trust here, a trust involving an inseparable fund, composed of interblended realty and personalty, and that the testator contemplated nothing else in the administration of his estate, and that the trust as to personal property is void because to sustain it would be to mutilate and maim his testamentary scheme. "It is a familiar principle," said the supreme court, in Carpenter v. Cook, 132 Cal. 625, 84 Am. St. Rep. 118, 64 Pac. 997, "that if several trusts are so inextricably interwoven, so mutually interdependent, that the destruction of one mutilates and maims in essential particulars the trust scheme, the whole must fall." In the Estate of Fair, 132 Cal. 541, 84 Am. St.

Rep. 70, 60 Pac. 442, 64 Pac. 1000, the court say: "The appellants invoke the aid of the principle, that where several trusts are created by will, which are independent of each other, and each complete in itself, some of which are lawful and others unlawful, and which may be separated from each other, the illegal trust may be cut off and the legal one permitted to stand. This rule is of frequent application in the construction of wills, but it can only be applied in aid and assistance of the manifest intent of the testator, and never where it would lead to a result contrary to the purposes of the will, or work injustice among the beneficiaries, or defeat the testator's scheme for the disposal of his property."

In the second decision of the same case (136 Cal. 81, 68 Pac. 306) it is said that the general rule is well settled that where "there are valid and invalid clauses in a will, the question whether the valid clauses can stand depends upon whether or not the invalid ones are so interwoven with them that they cannot be eliminated without interfering with and changing the main scheme of the testator." Again it was said, quoting from an authority: "Where a will is good in part and bad in part, the part otherwise valid is void if it works such a distribution of the estate as, from the whole testament taken together, was evidently never the design of the testator."

In this will there is no distinction between the realty and the personalty; they are united in one inseparable trust. The trustees are given full control over both kinds of property. They could use the personal property to pay the expenses of maintaining and improving the real property. They are expressly given power "in their discretion" to sell any and all property, real *or* personal, and to invest and reinvest, as in the Fair case: 136 Cal. 82, 68 Pac. 306. "It is, therefore, obvious, indeed too clear for reasonable controversy on the point, that the realty and personalty are so inseparably interwoven in the trust scheme that the destruction of the fabric as to the realty inevitably destroys it as to the personalty." It must be considered as a unit. To undertake to treat it as a trust of personalty and realty separably would be destructive of the purpose of the testator, the essential feature of which was, division into three parts, his entire estate, real and personal, to be divided into three equal parts; that is his

language; there is no escape from it. We have no right to assume that he meant more or less than what his words mean. We are to ascertain his real meaning from the words that he has used. Giving effect to all his language, it is manifest that he designed to impose upon the trustees the duty of dividing all of his estate in the manner and on contingency specified. They are given the power and duty of making the division and are charged with an active trust. There is a clear intent to dispose of all the testator's property, including both real and personal, and both species are to go to the beneficiaries merely through the hands and by the action of the trustees. For this purpose there was a special trust and confidence reposed in them by testator. In his mind the entire estate was blended and the court should not attempt a separation. He did not so direct. The language of Palms v. Palms, 68 Mich. 365, 36 N. W. 419, is in point: "Had the will directed the real estate to be converted into personalty it would in equity have been so treated and the tenth clause would in that event have been valid. But the testator did not so direct. It authorizes investments to be made as the trustees shall deem for the best interests of the estate, and to lease, repair and improve the property confided to their management, and contemplates that certain property may remain real estate. Neither do I think it proper that the real estate and personal property devised to the trustees as it came to their hands should be kept separate in order to apply to each the rules controlling their disposition. The testator has placed it all in one trust and subjected it to the same disposition. He has made no distinction, and I think it clear that we can make none for him. If, therefore, the trust as to any portion of the will must fail because unauthorized, it must fail as to both classes of property": Fisher v. Butz, 224 Ill. 379, 115 Am. St. Rep. 160, 79 N. E. 659; Story v. Palmer, 46 N. J. Eq. 1, 18 Atl. 363; Savage v. Burnham, 17 N. Y. 570.

In the Estate of Naglee, 52 Pa. 160, Mr. Justice Strong said, in answer to the objection urged that the personal estate was not liable to the division under the terms of the will and that the intention was that the real estate should also remain undivided, that he dissented entirely from this view, for, in his opinion, both realty and personality were given to the

trustees. The two kinds of property were blended, and formed constituents of one fund, and as one estate they were made subject to partition on a specified contingency. The testator's intention was as clear as language could make it, that division of both should be made in that contingency. The realty and personalty were united in the same trust to be held together, for the subject of the will was one, though composed of different parts. It is the estate given to the trustees to be treated as one fund and contemplated by the testator to be distributed in one partition. Justice Strong uses interconvertibly, "division" and "partition."

It is said by petitioners that to maintain the integrity of these trusts is a strange doctrine and would lead to peculiar consequences violative of the testamentary intention; but it should seem from the foregoing that it is not of novel impression, but is supported by weighty authority, at home and abroad. As to the consequences, we must meet the will face to face, and take it at its face value. The consequences of inseparability may be such that with the fall of the realty trust, the personalty trust must go down—that the provisions of the will are futile, and the estate real and personal is intestate. If the vicious proposition may not be separated from the valid, both fall together, and the defeat of the entire trust is encompassed by this vitiation. We are concerned *not* with its consequences, but with its commands. We must obey its orders, its express mandate, be the result what it may. We cannot reconstruct this will in an attempt to construe it. The trustees are vested with an important function, if the trust be valid, and this tribunal may not enlarge nor diminish their power; it may, perhaps, regulate its exercise; it cannot add to nor subtract; it must pursue the testamentary provisions to the point of final distribution when the will shall be merged in the decree.

### THE FUNCTION OF THE TRUSTEES.

Now, what are the functions of these trustees, conceived to be so important, and of the substance of the trust? These functions are described very clearly in the instrument. The whole fee is vested in the trustees to carry out certain purposes declared in paragraph second, as already recited. That

fee remains vested in them until transferred pursuant to the trust. There can be no transfer until the division shall he made. This is of the substance of the trust. It is a trust in terms to divide and transfer to the sons. In respect to the daughter, it is to pay her the net annual income from the principal of the remaining one-third part and upon her death to pay over the principal to her children *then* living, or to their issue if no children be then surviving. There is here no gift except in certain contingencies. The element of time is now attached to the testamentary disposition. Upon the death of Emma without child or grandchild surviving, the trustees shall pay over the principal of that third with accumulations to the two sons, and, in that contingency, it shall become theirs absolutely and forever. There is no present gift; it is a direction to the trustees to do something at a future time dependent upon conditions then to be ascertained. A future interest is contingent, when the person in whom, or the event upon which, it is limited to take effect remains ·uncertain: Civ. Code, sec. 863. Where the only gift is found in a direction to divide at a future time, the gift is future and not immediate, contingent and not vested. It is the uncertainty as to the precise persons who are ultimately to take that introduces the element of contingency: Townshend v. Frommer, 125 N. Y. 446, 26 N. E. 805. Unquestionably the interest of the unborn children is contingent, because it is uncertain whether they will ever come into existence: Estate of Washburn (Cal. App.), 106 Pac. 415. The persons who come within this category cannot be ascertained prior to the date when the division or distribution is to be made: In re Baer, 147 N. Y. 353, 41 N. E. 702. Meanwhile there cannot be a vesting; consequently the gift is contingent. In such a case, says the authority just cited, the gift is contingent upon survivorship, liable to be devested by the death before that time of a person presumptively entitled to share in the distribution. It should seem quite clear, then, upon the authorities, that this is a contingent limitation; that the gift is future, not immediate; that the persons who would finally be entitled to the remainder could not be determined until the death of the daughter, because until that event it could not be known whether any of those coming within the category would be

living at that time, and unless living the gift would entirely fail.

## AN UNDUE SUSPENSION OF ALIENATION.

If these propositions be accepted, that the trust is inseverable, and that the fee vests in the trustees until the contingency contemplated happens, then there is an undue suspension of the power of alienation, and the trust is, on that account, void. It contravenes the code provisions prohibiting the suspension of the power of alienation: Civ. Code, secs. 715, 716, 749; Estate of Walkerly, 108 Cal. 647, 49 Am. St. Rep. 97, 41 Pac. 772. In the Walkerly case the court said that such a trust cannot be terminated during the period fixed for the existence, even by the consent and joint act of all the trustees and beneficiaries. An attempt by the trustees to convey before that time would contravene the trust and be a void act: Civ. Code, sec. 870. ''So even by this method of progression our path leads to that barrier of perpetuity which cannot be surmounted'': 108 Cal. 649, 49 Am. St. Rep. 97, 41 Pac. 772. What is a perpetuity? It is, according to the Estate of Steele, 124 Cal. 537, 57 Pac. 564, any limitation or condition which may (not which will or must) take away or suspend the absolute power of alienation for a period beyond the continuance of lives in being. The absolute power of alienation is equivalent to the power of conveying an absolute fee: In re Walkerly, 108 Cal. 647, 49 Am. St. Rep. 97, 41 Pac. 772. This is but a paraphrase of section 716, supra, which declares ''void in its creation'' every future interest which, ''by any possibility, may suspend,'' etc. The statute does not permit us to wait and see whether events may not so transpire that in fact no perpetuity results, but if under the terms of the deed or will creating the trust, when properly construed, the instrument ''by any possibility may suspend'' the absolute power of alienation beyond the continuance of lives in being, the instrument, whether a deed or will, is void, and no trust is created nor any estate vested in the trustee. If the trust is valid, being an express trust, the beneficiaries take no estate or interest in the property, but may enforce the performance of the trust: Civ. Code, sec. 863; Bouvier's Dictionary; Estate of Hinckley, 58 Cal. 457.

This language is substantially a repetition of the Atlantic authorities which hold, in interpreting the statute, that to render such future estates valid, they must be so limited that in every possible contingency they will absolutely terminate at such period, or such estate will be held void: Schettler v. Smith, 41 N. Y. 328; In re Wilcox, 194 N. Y. 288, 87 N. E. 497.

### THE RULES APPLY ALIKE TO REAL AND PERSONAL PROPERTY.

It does not matter whether it is a trust of real or of personal property—in this case it is both—the rules apply alike. In Mills v. Husson, 140 N. Y. 105, 35 N. E. 422, the court said that it has been uniformly held that the rules governing estates or interests in lands, whether founded upon statutes or upon general principles of law, should, as far as practicable, be applied to estates of a like character in personal property. The court further said that even if the provisions of the statute were not sufficiently comprehensive absolutely to require, as a peremptory injunction of statute law, their application in all their length and breadth, and in the same degree to both classes of property, the argument to be derived from the general similarity of legislative enactments, in regard to both classes of property, from the similar if not equal mischiefs to be remedied, and from the general policy of the law, would authorize a court of equity in the exercise of its acknowledged powers, to apply the same rule of construction to both.

There is certainly "much force in the position that one body of law should not declare a different rule for two kinds of property, when there is nothing in the nature of either kind of property, or in the nature and effect of the rule that calls for it."

There is a manifest propriety, said the court in Cochrane v. Schell, 140 N. Y. 534, 35 N. E. 971, in assimilating the rules governing trusts and limitations of real and personal property, and the tendency in this direction has been very marked in the decisions. This view seems to have been taken in Toland v. Toland, 123 Cal. 144, 55 Pac. 681. In the Walkerly case, 108 Cal. 627, it was pointed out that the essential difference in California between trusts in real property

known as express trusts, and those in personal property are: 1. The former can only be of the kinds permitted by the statute, and no others (Civ. Code, sec. 857), while the latter may be created generally for any purpose for which a contract may be made (Civ. Code, sec. 2220); 2. The former must be created and declared by writing (Civ. Code, sec. 852), while the latter may rest upon parol: Civ. Code, sec. 2222. But to all trusts, whether of real or personal property, the limitation upon the suspension of the power of alienation expressed in section 715 of the Civil Code directly applies. The section is found in division 2, part 1, title 2, of the code where the lawmakers are dealing, as expressly declared, with the modifications of ownership and restraints upon alienation of property in general.

That the same rules govern both kinds of property would seem to be the deduction of our own supreme court in the case just cited wherein it is remarked that section 771 of the Civil Code demonstrates the applicability of the law to personal property. That section reads:

"The suspension of all power to alienate the subject of a trust, other than a power to exchange it for other property to be held upon the same trust, or to sell it and reinvest the proceeds to be held upon the same trust, is a suspension of the power of alienation, within the meaning of section seven hundred and fifteen": Civ. Code, sec. 771.

"For if," says the supreme court, "it be only the suspension of the power to alienate real property which is under the ban, power to sell the realty would relieve the difficulty, and yet it is by that section expressly declared that personal property held after sale under the terms of the original trust operates to suspend the power of alienation, under section 715 of the Civil Code. And finally, the applicability of section 715 to trusts in personal property has often been recognized, and never questioned: Estate of Hinckley, supra; Goldtree v. Thompson, 79 Cal. 613, 22 Pac. 50; Williams v. Williams, 73 Cal. 99, 14 Pac. 394; Whitney v. Dodge, 105 Cal. 192, 38 Pac. 636."

So far we have dealt with the second paragraph of the will and have arrived at the conclusion that it does not create a valid trust. Indeed, this is conceded by petitioners, despite

their prayer for a distribution to them as trustees, but they insist upon the severability of the trust as to real and personal property, and maintain that it is the duty of the court to sever the trust if possible. But the authorities do not sustain this contention. The same cases and text-books are cited with confidence by both sides, but they do not seem to support the position assumed by petitioners, as has been sufficiently shown in this opinion. It is not a correct construction of this will to conclude from its terms, as argued by petitioners, that there are but two trusts; one trust for the benefit of the widow and one for the benefit of the daughter; that those are the only trusts here, and that the disposition of the property upon the termination of those trusts is made by way of devise and not by way of trust, and that the testator intended that the two sons should take title before any division. This is a contradiction of the very words of the will, which it is unnecessary to repeat.

Up to the time of the event indicated in clause (b) of paragraph second the estate was to be held intact by the trustees, to hold jointly for certain specified purposes. These purposes need not be restated. In the third paragraph of his will it is provided that if his son Claus A. be not living at the time of the death of the testator or his widow, then all the legacies and devises "given to him by this will" shall go to his lawful issue, share and share alike, and the same shall be and become theirs absolutely and forever. He repeats literally the same provisions as to Rudolph. That is all there is of the third paragraph. What is meant by its terms? It is not an original gift. It is a short method of stating what is already contained in paragraph second. When he speaks of what is "given to him by this will" it plainly refers to the preceding paragraph. The issue therein alluded to take by substitution the estate devised to the trustees as it shall be divided by them according to the provisions of paragraph second. The right of the trustees to take anything individually is dependent upon their being alive at the death of their mother, and there must be a precedent division and segregation of the estate; their interests or equities are purely contingent; the ultimate limitation shows that the title must remain in the trustees; and the trust does *not* ter-

minate with the life of the widow of the testator: Paget v. Melcher, 156 N. Y. 399, 51 N. E. 24; Fargo v. Squiers, 154 N. Y. 250, 48 N. E. 509.

The trust does not cease, because the trustees are still charged with duties that they may not neglect upon penalty of removal. If they fail to perform their functions they are liable to extrusion, and successors may be appointed to complete the testamentary trust purpose. Until this work is finished, title remains in the trustees. Before that time it cannot be known who are the beneficiaries; in the interim both the legal and equitable estates are in the trustees, and the vesting in the beneficiaries must await the expiration of the prescribed period; whatever interests they may have must remain in abeyance; and, it is possible, may never take effect; for the provisions of the will leave the persons who may ultimately take possession quite uncertain: Fargo v. Squiers, 154 N. Y. 260, 48 N. E. 509.

### NO DIRECT DEVISE TO INDIVIDUALS IN THIS WILL.

It cannot successfully be maintained, as this court understands the authorities, that there is any direct devise to individuals in this will. What is given by paragraph second constitutes a clear and direct devise to the trustees as such and cannot be reduced or modified by any subsequent provision of a less certain and distinct character: Civ. Code, sec. 1322. It is not in accord with this rule of construction to assume that testator meant to qualify in the third what he so distinctly declared in the second paragraph. It is more consonant with reason to infer that the intention of the testator in the third paragraph was that the beneficiaries were to hold individually and separately after the transfer from the trustees; and that the original and substitutionary gifts were the same; that the trustees as such take jointly by the second but individually by the third paragraph. Petitioners protest, however, that there was no such intention in the mind of testator, and that he certainly intended and expressly declared that the two sons here opposing this application should receive nothing for the reason that he had already given them a large share of his estate; but the Civil Code says, section 1322, that a clear and distinct devise or bequest cannot be affected

by any reasons assigned therefor, or by any other words not equally clear and distinct, or by inference or argument from other parts of the will, or by an inaccurate recital or reference to its contents in another part of the will. No matter what reason testator assigned for the exclusion of the two sons mentioned in paragraph fourth, it cannot affect the general scheme of the will.

Paragraph third is dependent upon paragraph second. If in this second paragraph an absolute estate has been conveyed, the authorities all agree that it will not be cut down or limited by subsequent words, except such as indicate as clear an intention therefor as was shown by the words creating the estate: Estate of Marti, 132 Cal. 672, 61 Pac. 964; 64 Pac. 1071. It follows that if the estate attempted to be created by the second paragraph be void, there is nothing whereby the subject matter of the third can be supported. The thing must fall to the ground if once its support can be severed from it: 2 Blackstone, 168. The third paragraph is simply a succinct summation of conditions contingent upon the failure of precedent provisions.

The trustees have no power to deal with this property by process of alienation until the death of the widow of testator, and even then only to transfer to the beneficiaries in fulfillment of the trust.

This necessarily involves a suspension of the power of alienation, under the statute, and it has been held that the mere possibility of such a suspension vitiates the trust: Hawley v. James, 16 Wend. 62; Estate of Hendy, 118 Cal. 656, 50 Pac. 753.

In this latter case the supreme court said that it was held in the Walkerly case, as uniformly it has been held under laws similar to our own, that the utmost limit of the period of suspension of the power of limitation by any trust or future estate must not by any possibility exceed existing lives, or the trust or estate will be void in its creation. "No absolute or certain term, however short, can be supported": Crew v. Pratt, 119 Cal. 139, 51 Pac. 38.

It is claimed by petitioners that the mere creation of a trust does not suspend alienation, and that the statute is aimed at the creation of inalienable estates; and that there is

no unlawful perpetuity unless the power of alienation is suspended; and that the provisions of his will are not illegally suspend that power. These contentions have been already answered by the authorities cited. There is a trust term created and during that term the trustees may not alienate. No matter how brief or inappreciable the duration of the term, it is sufficient to destroy the trust. The estate is tied up in the trust, and until the widow of testator dies, there can be no alienation. A bare possibility that the condition upon which the estate is to vest may *not* happen within the prescribed limits is all that is required to bring the devise within the rule, and, therefore, it follows necessarily that it offends the statute and is void: Johnson v. Preston, 226 Ill. 447, 80 N. E. 1001, 10 L. R. A., N. S., 564; Underwood v. Curtis, 127 N. Y. 523, 28 N. E. 585.

### AN INTEGRAL TRUST NOT SEVERED OR SEVERABLE.

It is assumed and asserted by the petitioners that the trust for the benefit of the widow ceasing with her death thereupon title vests in the two sons, but this assertion is not well based, since it assumed two trusts in the will, whereas there is but one and that a continuing trust, that is not severed or severable, but persists until the happening of the contingent event mentioned in the will. Petitioners say that if the sons should die without issue, there is no substitution; it is only in case of leaving the issue in the contingency provided in the will that there is a substitution; but this is not clear; rather, it should seem, that the design of the testator was to place the issue of the son or sons in the precise position the father would have occupied if the latter had survived. The original purpose or intent of the testator cannot be affected by any accident to the object of his bounty; the event cannot always be foreseen as to time of happening, as in case of death, or other circumstance, which renders the devise or bequest contingent. As was said in Shipman v. Rollins, 98 N. Y. 323, any other construction would impute to the testator a design to effect an object contrary to the plain meaning of the language employed. "It should be borne in mind that the fund out of which the legacies in question were to be paid had no legal existence until the decease of the testator's

widow." Where there is no gift but by a direction to ex-ecutors or trustees to pay or divide, and to do that at a future time, the vesting in the beneficiary will not take place until that time arrives: Warner v. Durant, 76 N. Y. 136. Where the gift is found only in a direction to the trustees to pay at a future time, time is deemed to be of the essence: Clark v. Cammann, 160 N. Y. 325, 54 N. E. 709; Delafield v. Shipman, 103 N. Y. 463, 9 N. E. 184.

We have said that this testamentary trust is a unit and a continuing trust, and that it does not end with the death of the widow; that on her demise the estate is to be divided by the trustees into three equal parts, when one of said parts is to be transferred by the trustees to Claus A., one to Rudolph, and one to be held upon a further trust during the life of Mrs. Ferris. This is an integral trust. It is plain that it does not end with the death of the widow, but continues indefinitely beyond, for after that event obligations of an onerous character are cast upon the trustees. Prior to that time their duties may be light and perfunctory, but after that they become difficult and delicate, requiring great skill and business capacity of an unusual order. It is apparent that the administration of this trust, consequent upon the division and transfer, demands an uncommon degree of ability, knowledge and experience, and that it cannot be accomplished in a mechanical manner. It is a task of magnitude and complexity, an estate of many millions in value, of multiform character, the evolution of years of labor and commercial genius, obviously necessitating extraordinary care and prudence in its management and a reasonable time to carry out testator's purpose, for the will does not execute itself; it must be executed by the trustees. Testator was not his own conveyancer. His purpose could not be executed automatically, but through the activities of his nominated trustees. It is an active, not a passive, trust. The trustees have something to do, and to do it properly, they have to call into exercise high qualities of integrity and sagacity. Time is needed for consideration, and sufficient time should be allowed them for deliberation as to the wise execution of the trust. It is to be expected that trustees, especially where the estate is large and diversified, will have temporary disagree-

ments as to the methods of executing the trust. Reasonable time must be given them to ascertain and consider all elements that should influence and control their judgment: Fischer v. Butz, 224 Ill. 379, 115 Am. St. Rep. 160, 79 N. E. 659; Story v. Palmer, 46 N. J. Eq. 1, 18 Atl. 363. While the trustees are so engaged, necessarily the trust term continues current. The possibility of issue is always present. Either of the sons or the daughter may have a child or grandchild born subsequent to the death of the testator or during the life interest of the widow in the trust. Such issue would be persons not in being at the date of the death of testator. It is possible, also, that the three named children of testator might not survive the widow; but still the trust continues for the benefit of the afterborn children. Hence a possibility of division among persons not in being at the death of testator, and a failure thereby of the trust, according to the authorities cited: Smith v. Edwards, 88 N. Y. 92.

It is impossible to ascertain in advance who will ultimately take.

Until the happening of the future event it must remain uncertain whether it be anyone in existence at testator's death, and it might be a grandchild born twenty years later. This is decisive of the question discussed: Andrews v. Rice, 53 Conn. 566, 5 Atl. 823; Hobson v. Hale, 95 N. Y. 615. It cannot be said to be known who may be the issue, because the possibility exists of the birth of a posthumous child, and while that possibility continues the estate cannot be divided, and must, therefore, be held by the trustees: In re Bergdoll's Estate, 18 Pa. Co. Ct. Rep. 665. Such a trust necessarily suspends the absolute power of alienation of the whole trust estate.

No matter how well convinced the court may be of the interior intention of the testator, it must say finally, as it did at first, that the result must be determined by the language in which he chose to clothe his purpose; and if that language be not consistent with legal rules, this court has no choice but to declare it void as a testamentary trust under our statutes and the decisions constituting the law of the case.

Demurrers sustained.